59 CCPA

The **ULTRA–WHITE COMPANY, Inc.,**
Appellant,

v.

**JOHNSON CHEMICAL INDUSTRIES,
INC., Appellee.**

Patent Appeal No. 8679.

United States Court of Customs
and Patent Appeals.

Sept. 14, 1972.

Mason, Fenwick & Lawrence, Washington, D. C., attorneys of record, for appellant, Edward G. Fenwick, Jr., Washington, D. C., of counsel.

Appellee submits on record.

Before RICH, Acting Chief Judge, and ALMOND, BALDWIN, and LANE, Judges, and MALETZ, Judge, United States Customs Court, sitting by designation.

MALETZ, Judge.

This is an appeal by the Ultra-White Company (Ultra-White) from a decision of the Trademark Trial and Appeal Board[1] granting the petitions of Johnson Chemical Industries, Inc. (Johnson) to cancel Registration No. 713,679[2] of the mark "Bright White" for "laundry whitener in liquid and powdered form" and Registration No. 816,822[3] of the same mark for "chemical preparations for use as laundry whitener, textile preservative, textile softener and bacteriostat."

Johnson's petitions were predicated on asserted prior and continuous use since 1948 of the mark "Brightwhite" for its laundry neutralizing products. Johnson's position was that the "Bright White" mark of Ultra-White so resembles its own mark previously used in the United States and not abandoned as to be likely, when applied to Ultra-White's goods, "to cause confusion, or to cause mistake, or to deceive". 15 U.S.C. § 1052(d).

Briefly, the record shows that Johnson has used the marks "Brightwhite" or "Brightwhite Sour" since 1948 for a laundry sour and whitener[4] combination that it has advertised and sold to commercial laundries and distributors servicing the commercial laundry industry. In the period 1962–1967, its sales of that product approximated $50,000–$75,000 a year. The record further shows that Ultra-White has used the mark "Bright White" since about 1953 for a liquid or powder fabric whitener that it has sold directly or through jobbers to hospitals, hotels and other commercial laundries. From 1953 to 1960, Ultra-White's yearly sales of its product ranged from $1,000 to $10,000, with sales increasing to about $45,000 in 1967. Further, it is clear from the record that both parties have advertised in the same trade journals to the same class of consumers; have at times marketed their respective products through some of the same jobbers; and were at the time of testimony selling in nearly all states.

Against this background, the board stated:

> \* \* \* [T]he goods of the parties comprise commercial laundry chemicals having laundry whitening properties, and the specific differences between such goods are considered to be negligible. Similarly, no material distinction can be drawn between the marks in view of the fact that the word "SOUR" in petitioner's mark is but the descriptive name of the primary ingredient of petitioner's product and is therefore devoid of trademark significance. \* \* \*

> In view of the foregoing we are clearly of the opinion that the contemporaneous use by the parties of the identical term "BRIGHTWHITE" or "BRIGHT WHITE" for the specified goods would be quite likely to cause confusion or mistake or to deceive.

▇▇▇ Appellant insists, however, that the board erred in failing to recognize the alleged specific differences in the marks involved and the "substantial differences" between the products of the parties. We do not agree. In the first place, there can be no doubt that one of the principal ingredients of the mer-

---

1. Abstracted at 162 USPQ 638 (1969).

2. Issued April 4, 1961 on the Supplemental Register, and asserting first use in commerce in April 1957.

3. Issued October 18, 1966 on the Principal Register, and asserting first use in commerce in April 1957.

4. The record shows that a "laundry sour" is used by commercial laundries as a neutralizing agent to reduce alkalinity left in fabrics after washing, thus functioning to maintain or preserve the fabric's original color and strength. A "whitener" is a fluorescent dye (optical brightening agent), the purpose of which is to whiten or brighten laundry without bleach.

chandise of both parties is an optical brightening agent, and that both products are designed to be used in a rinse cycle subsequent to the wash cycle in the commercial laundry. Furthermore, appellant's own documentary exhibits 3 and 13, which a witness testified had been in use for the past 10 years as a product label and advertising brochure, respectively, both relate that the product to which the mark "Bright White" is applied "may be used as a sour." [5] In view of these considerations, it is difficult for us to see any practical "difference" between the marks or goods of the parties. Thus, we agree with the board's conclusion that a purchaser familiar with appellee's line of "Brightwhite" or "Brightwhite Sour" laundry neutralizing agent/whitener combination would, on encountering "Bright White" laundry whitener, be likely by reason of confusion or mistake to accept the latter in anticipation of getting the former, or be likely to confuse or mistake the origin of the goods. Ultra-White, it is to be added, maintains that the record is devoid of evidence of actual confusion or mistake [6] on the part of purchasers. However, even a complete lack of such evidence would not preclude a finding of likelihood of confusion or mistake. In re Calgon Corp., 435 F.2d 596, 58 CCPA 830, (1971); Salem Commodities, Inc. v. Miami Margarine Co., 44 CCPA 932, 244 F.2d 729, (1957).

■ Appellant Ultra-White's principal argument seems to be that Johnson should be estopped from alleging that it will be damaged by the continued registrations of Ultra-White's mark. As to this, the record indicates that Johnson became aware of Ultra-White's use of "Bright White" in 1960. On December 7, 1960, counsel for Johnson wrote Ultra-White's president requesting that it "immediately stop" the use of that mark in light of Johnson's previous use of its marks on substantially identical products. On April 7, 1961, Ultra-White advised Johnson that it would not discontinue use of "Bright White". No further action was taken by Johnson until the filing in July and November 1967 of its cancellation petitions directed to the registrations granted in October 1966 and April 1961 on the Principal and Supplemental Registers. In view of the actual knowledge possessed by Johnson since 1960 regarding Ultra-White's use of the mark, Ultra-White contends the board erred in failing to consider "the classical elements of laches and estoppel which exist in this record."

The board did not agree with appellant that it is appropriate to apply the equitable defenses set forth in 15 U.S.C. § 1069 [7] under the present circumstances, nor do we. This is not a case wherein a likelihood of purchaser confusion or mistake is reasonably in doubt, and evidence of laches, estoppel or acquiescence may be considered as a factor in resolving that doubt. Compare In re National Distillers Products Co., 297 F. 2d 941, 49 CCPA 854 (1962). Rather, it appears to us that confusion or mistake here is not only likely but inevitable in light of the virtual identity of the parties' marks and goods, as well as the similarity of trade channels, market areas and advertising media. In such a situation, notwithstanding the equities between the parties and the equitable principles of § 1069, the public interest

5. On cross-examination, one of appellee's witnesses testified that, among several products Ultra-White calls "Bright White", "one [does] have a sour in it." As noted earlier, a "sour" functions to maintain or preserve fabric color and strength.

6. The record does contain testimony of Johnson's president on cross-examination that the president of one of its distributors

"called up and asked if we were manufacturing the ['Bright White'] product" of Ultra-White. Counsel for Ultra-White had earlier objected to similar testimony elicited on direct examination as hearsay.

7. This section provides that:
   In all inter partes proceedings equitable principles of laches, estoppel, and acquiescence, where applicable may be considered and applied.

expressed in § 1052 is the dominant consideration. See, e.g., Swank, Inc. v. Ravel Perfume Corp., 438 F.2d 622, 58 CCPA 948 (1971); Chun King Corp. v. Genii Plant Line, Inc., 403 F.2d 274, 56 CCPA 740 (1968); Cohen & Sons Co., Inc. v. Hearst Magazines, Inc., 220 F.2d 763, 42 CCPA 836 (1955); see also In re Avedis Zildjian Co., 394 F.2d 860, 55 CCPA 1126 (1968); In re Continental Baking Co., 390 F.2d 747, 55 CCPA 967 (1968).

The decision of the board is affirmed.

Affirmed.

BALDWIN, J., concurs in the result.

RICH, Acting Chief Judge (dissenting, with whom LANE, Judge, joins).

I dissent for much the same reason I did in In re Avedis Zildjian Co., 394 F. 2d 860, 863, 55 CCPA 1126, 1129 (1968); I believe that the register should reflect the realities of the marketplace. Admittedly, the cases are not on all fours. In *Zildjian* the appellant appeared to have an undisputed, *judicially sanctioned* right to use the trademark which the Patent Office and the majority of this court denied it the right to register.[1] Here there apparently has been no previous litigation between the owners of the respective marks, but it seems to me that 15 USC 1069 authorizes us to apply the same principles in passing on the right *to register* as would be applied by a court of general jurisdiction deciding an infringement case in passing on the right *to use.* In other words, this court (and the Patent Office in the first instance) should, in effect, attempt to predict the outcome of a hypothetical infringement action between the owners of the respective marks, to the extent that this may be done via the application of Federal trademark law.[2] Failure to do so leads to the incongruous result that a party may prevent the registration of a mark the use of which it cannot prevent, whether by reason of litigated judgment, Alfred Dunhill of London, Inc. v. Dunhill Tailored Clothes, Inc., 293 F.2d 685, 49 CCPA 730 (1961), cert. den., 369 U. S. 864, 82 S.Ct. 1030, 8 L.Ed.2d 84 (1962),[3] consent decree, In re Avedis Zildjian Co., supra, private contract, In re National Distillers & Chemical Corp., 297 F.2d 941, 49 CCPA 854 (1962), or, as here, acquiescence.

I am aware that the *National Distillers* case was overruled (by a vote of three to two) in In re Continental Baking Co., 390 F.2d 747, 55 CCPA 967 (1968), and that the three-judge majority's opinion in *Zildjian*, from which I dissented on the basis of my opinion for the majority in *Dunhill*, casts doubt on the continuing vitality of *Dunhill.* However, the majority opinion in *Dunhill*, my concurring opinion in *National Distillers*, my dissent in *Zildjian*, and my dissent in *Continental Baking* express my views on the question of conforming the register to the realities of the marketplace, and I continue to adhere to those views. I cannot understand what the majority thinks is accomplished by preventing or cancelling the registration of a mark which will continue in use. The lack of registration will have no effect on public confusion, one way or the other, but it will disadvantage the owner of the unregis-

---

1. I say "appeared to have" because there was some question concerning appellant's succession to the rights stemming from the consent decree. Both the majority and I accepted appellant's contention that it had succeeded to those rights, but Judge Smith concurred in the majority's decision solely on the ground that appellant had failed to establish that succession.

2. I am aware that this approach presents difficulties where federal and state trademark law diverge, as is the case, for example, with respect to "dilution" of trademark rights.

3. For the sequel to our decision in *Dunhill*, see Contemporary Trademark Problems in Contested Patent Office Proceedings, Practicing Law Institute (1969), pages 169–177. After a good deal of further litigation, the parties apparently wound up with concurrent registrations accurately reflecting their actual rights to use.

tered mark in asserting his substantive *rights* (which he still has, regardless of the lack of registration) against third parties, and it will detract from the usefulness of the register as a convenient means for determining what marks are actually in use without being in derogation of anyone's rights. The latter result, at least, is contrary to the intent of the authors of the Trademark Act as I understand it to have been.

It would richly reward the doubter to read the comments of Melvin R. Jenney on the views of this court as they were at the inception of the Trademark Act of 1946, presented in "A Plea for Realism in Trade-Mark Oppositions," 29 JPOS 668 (1947). The majority sentiments do not seem to have changed much. In interpreting the statute there still seems to be a dogged devotion to a stultifying literalism not conducive to carrying out the legislative intent. As incentive to dig deeper, I quote some titilating passages:

> A desirable condition would be that every one entitled to use a mark would also be entitled to register it. (P. 668.)

> What possible "damage" can accrue to the opposer from *registration* of a competitor's mark, if the competitor is free to *use* the mark in trade? (P. 670.)

> It is the purpose of this paper to show that the views of the Court of Customs and Patent Appeals are not only out of step with the views of the other Federal courts, but are also out of step with practices in industry and trade. The criteria established by the CCPA are generally ignored, and in fact must be ignored, if people are to do business. (P. 670.)

The CCPA seems to have dug itself into a hole from which it has been unable or unwilling to climb out. It has contented itself with setting up standards that may look all right on paper, but are unattainable in any real world. (P. 681.) [Footnote 6 on same page: Let the proponents of a single court of special jurisdiction for patent appeals ponder on the future of the system if the chosen court insists on straitjacketing itself.] The paucity of cases in which a successful opposition has been followed up is truly amazing. When one considers all of the oppositions that have been sustained by the Patent Office and by the CCPA and then sees how many of the defeated applicants continue to use their marks, apparently without molestation, he is led to wonder what the shooting was about. (P. 680.)

The question is, will the conditions be any different under the Act of 1946? Or will oppositions be treated in the same unreal manner? (P. 681.)

The only conclusion that can be reached is no conclusion at all. The court can go either way. * * * It is this writer's opinion that the unsatisfactory operation of the Act of 1905 was due in no small measure to the rigid interpretation forced upon it by the Court of Customs and Patent Appeals. An equally rigid interpretation will likewise hobble the Act of 1946. (P. 683.)

The first decisions of the court under the new act will reveal whether or not registration is going to be allowed to operate in harmony with the realities of trade. [The end.] (P. 684.)

In my opinion, the facts in this case give rise to an estoppel against Johnson. I would therefore reverse.