THIS OPINION IS A
PRECEDENT OF THE T.T.A.B.

Hearing: February 13, 2007     Mailed:  July 31, 2007

**UNITED STATES PATENT AND TRADEMARK OFFICE**

———

**Trademark Trial and Appeal Board**

———

The Christian Broadcasting Network, Inc.
v.
ABS-CBN International

———

Cancellation No. 92044366

———

Patrick J. Arnold, Jr. of McAndrews, Held & Malloy, Ltd.
for The Christian Broadcasting Network, Inc.

Nicole B. Emmons of Baker & McKenzie LLP for ABS-CBN
International.

———

Before Holtzman, Zervas, and Bergsman, Administrative
Trademark Judges.

Opinion by Bergsman, Administrative Trademark Judge:

The Christian Broadcasting Network, Inc. has petitioned

to cancel U.S. Trademark Registration No. 2334131, owned by

ABS-CBN International, for the mark ABS-CBN, in standard

character format, formerly referred to by the Trademark

Office as a "typed drawing," for the following services:

> "Television broadcasting services via satellite and
> cable," in Class 38;[1] and,

---

[1] With respect to the television broadcasting services,
respondent claimed January 1, 1967 as its date of first use
anywhere and July 1988 as its date of first use in commerce.  As
discussed *infra*, the testimony of respondent's witnesses
establish that respondent's first use in commerce was in 1994.

Cancellation No. 92044366

"Telephone calling card services," in Class 36.[2]
The registration issued on March 28, 2000. On June 9, 2006,
the Office accepted respondent's Section 8 declaration of
use.

Petitioner filed this cancellation on the ground of
priority of use and likelihood of confusion, alleging that
the mark ABS-CBN for television broadcasting services via
satellite and cable and telephone calling card services so
resembles petitioner's registered service marks for CBN and
variations thereof used in connection with television
broadcasting services and other related services as to be
likely to cause confusion. Petitioner also alleged
ownership of a family of CBN service marks.

Respondent denied the pertinent allegations of the
petition for cancellation. As affirmative defenses,
respondent asserted that petitioner is precluded by laches,
acquiescence, and estoppel from canceling respondent's
registration.

Both parties filed briefs, and an oral hearing was
held.

### The Record

By operation of the rules, the record includes the
pleadings and the ABS-CBN registration file. The record

---

[2] With respect to the telephone calling card services, respondent
claimed October, 1996 as its date of first use anywhere and first
use in commerce.

also includes testimony and evidence introduced by the parties.

A.    Petitioner's evidence.

Petitioner introduced the following testimony and evidence in support of its case:

1.    The testimony deposition of Michael D. Little, petitioner's President and Chief Operating Officer, with attached exhibits;

2.    The testimony deposition of John S. Turver, petitioner's Vice President of Marketing, with attached exhibits; and,

3.    Petitioner's notice of reliance on status and title copies of the following trademark registrations, which were pleaded in the petition for cancellation:

   a.    Registration No. 1,108,225 for the mark CBN for "television broadcasting services";[3]

   b.    Registration No. 2,087,580 for the mark CBN for the following services:

      1.    "Educational services, namely, seminars, workshops and conferences in the fields of Christian living, finances, marriages, veterans, and song writing," in Class 41; and,

      2.    "Christian evangelical ministerial services including outreach, counseling, and discipleship," in Class 42;[4]

   c.    Registration No. 2,200,212 for the mark CBN WORLDREACH for "Christian evangelical ministerial services including outreach,

---

[3] The registration issued on December 5, 1978.  Title to the registration is in petitioner's name, and the registration was renewed as of December 5, 1998.

[4] The registration issued on August 12, 1997.  Title to the registration is in petitioner's name.  Affidavits under Sections 8 and 15 of the Lanham Act have been accepted and acknowledged.

counseling, and discipleship," in Class 42;[5] and,

d.  Registration No. 2,520,307 for the mark CBN NEWS for "Entertainment, namely, television news shows," in Class 41.[6]

B.  Respondent's evidence

Respondent introduced the following testimony in support of its case:[7]

1.  The testimony deposition of Milagros Santisteban, respondent's Senior Manager for Advertising, Sales, and Program Syndication and Manager for Community Relations, with attached exhibits; and,

2.  The testimony deposition of Rafael Lopez, respondent's Managing Director, with attached exhibits.

Findings of fact

A.  Petitioner

Petitioner is a television production company.  It produces a variety of television programs for distribution in the United States and internationally.[8]  Petitioner's programming can be seen in 96% of U.S. households.[9] Petitioner explained that the purpose of its television programs is to send a message of hope and peace through

---

[5] The registration issued on October 27, 1998.  Title to the registration is in petitioner's name.  Affidavits under Sections 8 and 15 have been accepted and acknowledged.
[6] The registration issued on December 18, 2001.  Title to the registration is in petitioner's name.
[7] In its brief, respondent identified the testimony deposition of Joseph F. Fitzpatrick.  Although Mr. Fitzpatrick attended the depositions of petitioner's witnesses, he did not testify.
[8] Little Dep., p. 8.
[9] Turver Dep., p. 8.

education and instruction.  In addition to the television shows, petitioner uses its mark in connection with global evangelism and provides humanitarian and medical relief, particularly outside of the United States.[10]

Petitioner has used its CBN service mark in connection with television broadcasting services since at least as early as 1969.[11]  Initially, petitioner broadcast its television shows over the air and through cable.  With the advent of satellite broadcasting in or around 1977, petitioner broadcast its television programs via satellite and cable.[12]

THE 700 CLUB is petitioner's most popular television show.  It is a one-hour program broadcast Monday through Friday.[13]  Its daily average audience is over one million viewers, and its monthly cumulative or unique viewers comprise approximately seventeen (17) million households. Seventeen million households represent approximately 16% of the homes in the United States.[14]  Compared with MSNBC and CNN, the number of viewers for THE 700 CLUB is nearly twice the audience of programs broadcast on those networks, with the exception of LARRY KING LIVE and the show following

---

[10] Little Dep., p. 8; Turver Dep., p. 45.
[11] Little Dep., p. 10.
[12] Little Dep., pp. 44-46; Turver Dep. p. 5.
[13] Little Dep., pp. 28-29.
[14] Turver Dep., p. 9.

LARRY KING LIVE.[15] During THE 700 CLUB, petitioner advises viewers that it has telephone counselors available, and it receives approximately 11,000 telephone calls a day.[16] In addition to THE 700 CLUB, petitioner broadcasts CBN NEWS WATCH, a half-hour newscast, CBN ANIMATION, half-hour animated programs, and LIVING THE LIFE.[17]

Petitioner buys time on other broadcast networks. Petitioner's business model is to buy time following other popular programs such as THE TODAY SHOW, LIVE WITH REGIS AND KATHY LEE, GOOD MORNING AMERICA, or THE CBS MORNING NEWS.[18] Because a major focus of petitioner's programming is news reporting and commentary regarding events from around the world, petitioner's viewers encompass a broad cross-section of the general television viewing public.[19]

Petitioner has also used the CBN mark in connection with educational services in the field of Christian living, finances, marriages, veterans, and song writing, and Christian evangelical ministerial services including

---

[15] Turver Dep., pp. 11-12. Apparently, the large audience for LARRY KING LIVE carries over to the next program.

[16] Little Dep., pp. 38-39.

[17] Little Dep., pp. 28-29.

[18] Little Dep., pp. 68-69; Turver Dep., p. 47. The essence of this testimony is that petitioner targets secular television viewers, as well as religious viewers. Since Kathy Lee Gifford left LIVE WITH REGIS AND KATHY LEE on July 27, 2000, we assume that this reference in Mr. Little's testimony is simply illustrative of petitioner's business model. (LIVE WITH REGIS AND KATHY LEE, Wikipedia, The Free Encyclopedia, http://en.wikipedia.org/wiki/Live_with_Regis_and_Kelly (last visited July 17, 2007)).

[19] Turver Dep., pp. 9-11; Turver Dep., p. 47.

outreach, counseling, and discipleship since at least as early as 1961.[20]

Since at least as early as 1996, petitioner has been using the mark CBN WORLDREACH in connection with Christian evangelical ministerial services including outreach, counseling, and discipleship.[21]

Since at least as early as 1980, petitioner has been using the mark CBN NEWS in connection with television news shows.[22]

Since 1982, petitioner has been using the mark CBN ANIMATION in connection with Bible-themed programs.[23]

Petitioner's website at cbn.com receives approximately 1.5 million unique user sessions per month. The users are from all over the world, not just the United States.[24] Petitioner's website features links to CBN NEWS, SHOP CBN, CBN WORLDREACH, CBN ANIMATION, CBN PARTNERS, CBN NEWS WATCH, and CBN INTERACTIVE.[25] The website highlights television programming, presents current events and features lifestyle and Biblical content.[26]

Petitioner has four sources of revenue:

1.   Advertising sales or commercials;

---

[20] Little Dep., pp. 11-12.
[21] Little Dep., p. 14.
[22] Little Dep., pp. 15-16.
[23] Little Dep., pp. 11 and 16.
[24] Turver Dep., pp. 15-16.  See also Little Dep., p. 19.
[25] Little Dep., pp. 19-20; Exhibit 35.
[26] Turver Dep., p. 13.

2.	Product sales;

3.	Production services; and,

4.	Charitable gifts or donations.[27]

In addition, petitioner has an asset that it characterizes as "non-cash airtime revenue."  This is broadcast airtime reserved by petitioner for its use in perpetuity as part of its sale of the ABC Family Channel.[28]

Because the testimony regarding petitioner's revenues was designated as confidential, we do not set forth such revenues in our opinion.  We find such revenues substantial by any standard.

Petitioner engages in various advertising and promotional efforts to promote its television programs. These efforts include radio and television advertisements, magazine advertisements, trade shows, billboards, and advertisements posted in mass transit systems.  In addition, petitioner engages in direct marketing mailings to viewers and donors in connection with spiritual and educational topics.[29]  The testimony regarding petitioner's advertising and promotional expenses has been designated as confidential, and therefore we do not set forth such figures in our opinion.  We find that the advertising and promotional expenditures have been substantial.

---

[27] Turver Dep., pp. 20-21, 24.
[28] Turver Dep., p. 20-21.
[29] Turver Dep., pp. 27-34; Exhibit 15.

Upon request of its television viewers or through its counseling services, petitioner sends viewers brochures and pamphlets on successful, spiritual, and healthful living. Generally, petitioner will print and distribute approximately 200,000 informational or promotional brochures or pamphlets. These brochures and pamphlets display the CBN trademark. Petitioner sends out approximately 20 million pieces of mail a year displaying the CBN service mark.[30]

B.  Respondent

Respondent is a wholly owned subsidiary of ABS-CBN Broadcasting Corporation, a major television network in the Philippines. Its purpose is to serve the entertainment needs of the Filipino communities outside of the Philippines by distributing ABS-CBN programming via cable, premium subscriber service, satellite service through DirecTV, free television for several affiliates, and through the internet.[31] Respondent also distributes its programming through DVDs and video tapes.[32]

In addition to rebroadcasting ABS-CBN programming from the Philippines, respondent produces its own programming and acquires programs created in the United States. and from

---

[30] Little Dep., pp. 20-22; Exhibit 36; Turver Dep., p. 37.
[31] Lopez Dep., pp. 7-8; 10-11.
[32] Lopez Dep., p. 10; Santisteban Dep., p. 10.

Filipino sources other than ABS-CBN Broadcasting Corporation.[33]

In respondent's mark, ABS stands for Alto Broadcasting System and CBN stands for Chronicle Broadcasting Network.[34] ABS was formed in 1953, and CBN was formed in 1956. The two companies merged in 1957.[35] While television broadcasters generally use three letter call letters, respondent uses a 6-letter call-letter.[36]

Respondent first offered its television broadcasting services via cable in 1994.[37] Today, the major cable operators such as Comcast, Time Warner, Cox, Charter, and Adelphia broadcast respondent's programming nationwide.[38] The cable operators broadcast ABS-CBN programs via The Filipino Channel. The Filipino Channel broadcasts 24 hours a day and features dramas, music, sitcoms, variety shows, movies, talk shows, sports, and news.[39]

Respondent has been broadcasting via satellite since 1995.[40] Satellite subscribers receive the following ABS-CBN channels:

1.   The Filipino Channel;

2.   ANC, the ABS-CBN news channel;

---

[33] Lopez Dep., pp. 39-40.
[34] Lopez Dep., p. 28; Santisteban Dep., pp. 8-9.
[35] Santisteban, Dep., pp. 8-9.
[36] Lopez Dep., pp. 28-29.
[37] Lopez Dep., p. 11.
[38] Lopez Dep., pp. 11-13.
[39] Lopez Dep., pp. 13-14.
[40] Lopez Dep., pp. 15, 43.

3.    CinemaOne, an all-movie channel;

4.    Pinoy Central TV or PCTVE, a regional sports channel;

5.    DZMM, an AM radio news talk channel in the Philippines; and,

6.    DWRR 101.9, an FM radio music service.[41]

Respondent operated an independent satellite subscriber system until 2005.  By 2005, the number of satellite subscribers had reached 80,000.  Due to the large number of subscribers and the efforts needed to manage a satellite broadcasting system with such a large number of subscribers, respondent contracted with DirecTV to provide satellite service.  Through that change, respondent substituted DirecTV's 70,000 distributors for respondent's 300-400 dealer and installer network.  DirecTV subscribers may purchase the six-channel ABS-CBN package for $22.95 per month.[42]  As of March, 2006, respondent has grown to approximately 200,000 cable and satellite subscriber households in the United States.[43]

Respondent also offers disposable pre-paid telephone card, long distance telephone services, and a "rechargeable"

---

[41] Lopez Dep., pp. 14-15.
[42] Lopez Dep., pp. 16-18; Santisteban Dep., p. 15.
[43] Santisteban Dep., pp. 11-12.

telephone calling card, all under the ABS-CBN mark.[44]

Petitioner does not offer telephone calling card services.[45]

Since approximately 1997, petitioner, through its CBN Asia subsidiary, had been broadcasting on ABS-CBN Broadcasting Corporation's channel in the Philippines.[46] Based on its success in penetrating the Filipino market, CBN Asia approached respondent regarding broadcasting on The Filipino Channel in North America. In 2000 or 2001, CBN Asia contracted for an hour of broadcasting time every Sunday on The Filipino Channel in North America. In 2005, CBN Asia began to broadcast on The Filipino Channel in Europe and it has expressed interest in broadcasting on The Filipino Channel in Australia. Also, there have been discussions regarding CBN Asia's use of respondent's studio facilities in Redwood Shores, California for the production of television shows for the Filipino market in the United States. Prior to this proceeding, neither CBN, nor CBN Asia, raised an issue regarding the similarity of the parties' trademarks.[47]

Because CBN Asia broadcasts on respondent's channels in the United States, consumers are exposed to both the CBN and ABS-CBN service marks simultaneously.

---

[44] Lopez Dep., pp. 18-20.
[45] Little Dep., pp. 65-66.
[46] CBN Asia is petitioner's Philippine subsidiary. Petitioner's Reply Brief, p. 9.
[47] Lopez Dep., pp. 33-37.

> What I mean is that in watching our TV programs you're constantly seeing the ABS-CBN logo and the ABS-CBN brand name, and when CBN Asia blocked times on ABS-CBN you also see the ABS-CBN (sic) logo. So many times it might - - you might see the CBN logo on one screen and in the next second see the ABS-CBN logo. So the CBN logo, because they blocked time on ABS-CBN, their logo is prominently displayed in their programs, which they show their logo constantly.[48]

## Standing

Because petitioner has properly made its pleaded registrations of record, petitioner has established its standing to cancel respondent's registration. *Cunningham v. Laser Golf Corp.,* 222 F.3d 943, 55 USPQ2d 1842, 1844 (Fed. Cir. 2000); *Lipton Industries, Inc. v. Ralston Purina Co.,* 670 F.2d 1024, 213 USPQ 185, 189 (CCPA 1982).

## Priority

Where both petitioner and respondent are owners of registrations, petitioner must prove priority of use. *Henry Siegel Co. v. M & R Mfg. Co.,* 4 USPQ2d 1154, 1160 n.9 (TTAB 1987); *American Standard Inc. v. AQM Corp.,* 208 USPQ 840, 841-842 (TTAB 1980); *SCOA Industries Inc. v. Kennedy & Cohen, Inc.,* 188 USPQ 411, 413 (TTAB 1975). In proving its priority of use, petitioner may rely upon the filing date of its application for registration as evidence of its use of the mark. *Henry Siegel Co. v. M & R Mfg. Co., supra;*

13

*American Standard Inc. v. AQM Corp., supra.* Petitioner has used its CBN service mark in commerce in connection with television broadcasting services since at least as early as 1969[49] and filed its application to register the mark CBN for television broadcasting services on September 17, 1975. Respondent began using its ABS-CBN mark in commerce in 1994,[50] and did not file its application for registration until 1997. In view thereof, petitioner has proven that it has priority of use with respect to these services.

<u>Likelihood of confusion</u>

Our determination of likelihood of confusion under Section 2(d) of the Lanham Act is based on an analysis of all the facts in evidence that are relevant to the factors bearing on the likelihood of confusion issue. *In re E. I. du Pont de Nemours & Co.,* 476 F.2d 1357, 177 USPQ 563, 567 (CCPA 1973).

A.   <u>Family of Marks</u>.

In our likelihood of confusion analysis, we first consider petitioner's claim to ownership of a family of CBN marks.

> A family of marks is a group of marks
> having a recognizable common
> characteristic, wherein the marks are
> composed and used in such a way that the

---

[48] Lopez Dep., p. 46.
[49] Little Dep., p. 10.
[50] Lopez Dep., P. 11.

14

> public associates not only the individual marks, but also the common characteristic of the family, with the trademark owner.  Simply using a series of similar marks does not of itself establish the existence of a family.  There must be recognition among the purchasing public that the common characteristic is indicative of a common origin of the goods.

*J & J Snack Foods Corp. v. McDonald's Corp.*, 932 F.2d 1460, 18 USPQ2d 1889, 1891 (Fed. Cir. 1991).

To establish a family of marks, petitioner must prove: (1) that prior to respondent's use of its mark, the marks comprising petitioner's family of marks, or at least a substantial number of them, were used and promoted together by petitioner in such a manner as to create public recognition coupled with an association of common origin predicated upon the family feature; and (2) that the family feature is distinctive (*i.e.,* not descriptive, so highly suggestive, or so commonly used that it cannot function as a distinguishing characteristic of the party's mark).  *Marion Laboratories v. Biochemical/Diagnostics*, 6 USPQ2d 1215, 1218 (TTAB 1988).

Petitioner has not argued that it has used and promoted together a group of CBN marks.  Rather, petitioner has argued that it has a family of CBN marks because it uses CBN in connection with a variety of different services (*e.g.,* CBN NEWS for television news shows, CBN WORLDREACH for

Christian evangelical ministerial services, CBN ANIMATION for Bible themed animation programs, etc.).[51]

Petitioner's website is the only exhibit in the record displaying multiple uses of CBN.[52] However, the website is not sufficient to establish that petitioner has a family of CBN marks. First, there is no testimony or other evidence establishing that petitioner posted its website prior to either respondent's first use of ABS-CBN in commerce (1994) or the filing date of respondent's application for registration (April 25, 1997). Second, the different references to CBN as displayed on the webpages of record are simply links to other webpages (*e.g.,* CBN News, CBN Outreach, CBN Television). The website links do not create the commercial impression that CBN is the common feature of a family of trademarks. Thus, petitioner has not met the first part of the test (*i.e.,* that petitioner promoted its marks together prior to respondent's use of its mark).

Even if petitioner had established a family of CBN marks (*i.e.,* CBN followed by another word such as CBN News, CBN Outreach, CBN Animation, etc.), respondent's mark ABS-CBN would not likely be viewed as a member of petitioner's CBN family of marks. Respondent's

---

[51] Petitioner's Brief, pp. 19-20.
[52] Petitioner's Exhibits 11 and 35.

16

mark is structured differently.  Rather than CBN followed by another word, respondent's mark is comprised of two sets of three letters - - ABS prior to CBN.

In view of the foregoing, we find that petitioner has not established that it has a family of CBN marks, or that respondent's mark would be viewed as a member of any such family.  Accordingly, we must consider the issue of likelihood of confusion with respect to petitioner's individual marks.  Because CBN for television broadcasting services is the closest of petitioner's marks to ABS-CBN, we will analyze likelihood of confusion with respect to this mark.

B.    The fame or relative strength of petitioner's mark.

This *du Pont* factor requires us to consider the fame of petitioner's mark.  Fame, if it exists, plays a dominant role in the likelihood of confusion analysis.  *Bose Corp. v. QSC Audio Products Inc.,* 293 F.3d 1367, 63 USPQ2d 1303, 1305 (Fed. Cir. 2002); *Recot Inc. v. M.C. Becton,* 214 F.3d 1322, 54 USPQ2d 1894, 1897 (Fed. Cir. 2000); *Kenner Parker Toys, Inc. v. Rose Art Industries, Inc.,* 963 F.2d 350, 22 USPQ2d 1453, 1456 (Fed. Cir. 1992).  Fame for likelihood of confusion purposes arises "as long as a significant portion of the relevant consuming public . . . recognizes the mark as a source indicator."  *Palm Bay Imports, Inc. v. Vueve Clicquot Ponsardin Maison Fondee En 1722,* 396 F.3d 1369, 73

USPQ2d 1689, 1694 (Fed. Cir. 2005).  In this case, the relevant class of consumers would be ordinary television viewers.

As indicated *supra*, petitioner has designated the specifics of its revenues and advertising expenditures as confidential.  We do not reveal those revenues and expenses, but find that petitioner has enjoyed great success in connection with television broadcasting services and evangelical services.  The testimony also provides the following:

1. Petitioner's programming can be seen in 96% of U.S. households.[53]

2. The daily average audience for petitioner's most popular television show, THE 700 CLUB, is over one million viewers or approximately 17 million unique households monthly, representing approximately 16% of the homes in the United States.[54]

3. Compared with MSNBC and CNN, the number of viewers for THE 700 CLUB is nearly twice the audience of programs broadcast on those networks, with the exception of LARRY KING LIVE;[55]

4. THE 700 CLUB generates approximately 11,000 daily telephone calls for petitioner's counselors.[56]

5. Petitioner's website at cbn.com receives approximately 1.5 million unique user sessions per month.  We note, however, that this is a global figure, not just U.S. web surfers.[57]

---

[53] Turver Dep., p. 8.  We understand that does not mean that petitioner's programming is, in fact, seen in 96% of the households.

[54] Turver Dep., p. 9.

[55] Turver Dep., pp. 11-12.

[56] Little Dep., pp. 38-39 (That's why 11,000 people call us every day, because we say 'Call CBN'").

[57] Turver Dep., pp. 15-16.  See also Little Dep., p. 19.

6. Petitioner sends out approximately 20 million pieces of mail a year displaying the CBN service mark.[58] We note, however, that this figure may not be limited to communications in the United States.

Based on the facts that petitioner's programming is regularly viewed in 16% of the homes in the United States, that its viewership is nearly twice that of MSNBC and CNN (except for LARRY KING LIVE and the show following LARRY KING LIVE), that petitioner has had substantial revenues and advertising expenses, and that the CBN mark is prominently displayed in all of petitioner's activities, petitioner has established that the CBN mark is famous for television broadcasting services and evangelical services, and therefore is entitled to a wide scope of protection.

C. The similarity or dissimilarity and nature of the services.

1. Television broadcasting services.

Petitioner has registered CBN for "television broadcasting services." Respondent has registered ABS-CBN for "television broadcasting services via satellite and cable." Respondent's services are included within petitioner's services.

2. Telephone calling card services.

Respondent has also registered ABS-CBN for "telephone calling card services." Petitioner does not contend that respondent's "telephone calling card services" are similar

or related to any of petitioner's services. Rather, petitioner argues that there is a likelihood of confusion simply because petitioner's mark is famous.[59]

Notwithstanding the fame of petitioner's mark, there must be a reasonable basis for the public to associate respondent's telephone calling card services with petitioner and its CBN service mark. *University of Notre Dame du Lac v. J. C. Gourmet Food Imports Co.,* 703 F.2d 1372, 217 USPQ 505, 507 (Fed. Cir. 1983). *See also Dymo Industries, Inc. v. Schramm, Inc.,* 181 USPQ 540, 541-542 (TTAB 1974); *American Optical Corporation v. Autotrol Corporation,* 175 USPQ 725, 729 (TTAB 1972). In the case *sub judice,* there is no such evidence. Accordingly, with respect to "telephone calling card services" the similarity or dissimilarity and nature of the services is a factor that favors respondent.

D.  The similarity or dissimilarity of established, likely-to-continue trade channels.

It is well-settled that the issue of likelihood of confusion between registered marks must be determined on the basis of the services as they are identified in the involved registrations, rather than what any evidence may show as to the actual nature of the services, their channels of trade, and/or classes of purchasers. *Canadian Imperial Bank of Commerce v. Wells Fargo Bank,* 811 F.2d 1490, 1 USPQ2d 1813,

---

[58] Little Dep., pp. 20-22; Exhibit 36; Turver Dep., p. 37.
[59] Petitioner's Brief, p. 22.

1815 (Fed. Cir. 1987); *In re Elbaum,* 211 USPQ 639, 640 (TTAB 1981). Because there are no restrictions as to the channels of trade in petitioner's registrations pertaining to television broadcasting services, we must consider petitioner's television broadcasting services as if they were rendered in all of the normal channels of trade to all of the normal purchasers of such services. *Canadian Imperial Bank of Commerce v. Wells Fargo Bank, supra; Toys R Us v. Lamps R Us,* 219 USPQ 340, 343 (TTAB 1983). Thus, as a matter of law, as well as fact, petitioner's television broadcasting services include distribution by satellite and cable.

In addition, petitioner's broadcast services are not limited to religious viewers, and respondent's broadcast services are not limited to Filipino viewers. Accordingly, the broadcast services of both parties encompass ordinary television viewers. Since we are bound by the description of services in the registrations of petitioner and respondent, the broadcast services of the parties include the same viewers.

Moreover, respondent's testimony establishes that petitioner has contracted with respondent to broadcast petitioner's programming through respondent's television broadcasting services, specifically on The Filipino Channel.

21

With respect to the television broadcasting services, the similarity of the trade channels is a factor that favors a finding of likelihood of confusion.

There was no evidence or argument with respect to the channels of trade vis-à-vis respondent's "telephone card calling services."

E.  The conditions under which and buyers to whom sales are made.

Neither petitioner's nor respondent's description of services are restricted as to classes of purchasers. Accordingly, we must presume that the parties' services are marketed to the usual classes of television viewers.  Given that respondent's services are encompassed within petitioner's television broadcasting services, it is presumed that they are provided to the same classes of purchasers.  In view of the nature of the services, and petitioner's testimony that its services are rendered to the general television viewing public, the relevant viewers would be expected to exercise nothing more than ordinary care in purchasing or viewing decisions.

With respect to television broadcasting services, the conditions under which and buyers to whom sales are made is a factor that weighs in favor of finding a likelihood of confusion.

There was no evidence or argument with respect to the conditions under which and buyers to whom sales are made vis-à-vis respondent's "telephone card calling services."

F.    The similarity or dissimilarity of the marks.

We now turn to the *du Pont* factor focusing on the similarity or dissimilarity of the marks in their entireties as to appearance, sound, connotation, and commercial impression. *In re E. I. du Pont de Nemours and Co., supra.* Respondent's mark ABS-CBN incorporates the entirety of petitioner's mark CBN. Likelihood of confusion has frequently been found where one mark incorporates the entirety of another mark. *In re Densi,* 225 USPQ 624, 626 (TTAB 1985) (PERRY'S PIZZA for restaurant services specializing in pizza and PERRY'S for restaurant and bar services); *Johnson Publishing Co. v. International Development Ltd.,* 221 USPQ 155, 156 (TTAB 1982)(EBONY for cosmetics and EBONY DRUM for hairdressing and conditioner); *In re South Bend Toy Manufacturing Company, Inc.,* 218 USPQ 479, 480 (TTAB 1983)(LIL' LADY BUG for toy doll carriages and LITTLE LADY for doll clothing). The presence of the prefix letter string "ABS" in respondent's mark would, for many television viewers, serve to suggest that ABS-CBN may

be a specific television channel within petitioner's broadcasting network.

We do not find persuasive respondent's argument that the marks are not similar because ABS is the dominant portion of its mark. Because respondent's mark is comprised of two sets of three letters (ABS and CBN) separated by a hyphen (as opposed to a unitary six-letter string - - ABSCBN), the CBN in ABS-CBN stands apart from ABS and makes a separate visual impact. Also, according to respondent's testimony, because petitioner purchases broadcasting time on respondent's The Filipino Channel, petitioner's mark and respondent's mark may appear on consecutive screen shots. In this case, because respondent's mark incorporates CBN, the marks are visually similar.

With respect to the similarity of the sound of the marks, we agree with respondent that consumers who would pronounce the marks would do so by saying each individual letter:[60] that is, all the letters will be spoken. However, because there is a hyphen between ABS and CBN, the speaker will pause between the two letter strings (*i.e.,* A-B-S pause C-B-N) as opposed to running the two letter strings together (*i.e.,* A-B-S-C-B-N). Under this scenario, the marks sound similar.

---

[60] Respondent's Brief, p. 10.

Respondent contends that the connotations engendered by the marks are not similar because the marks are acronyms or initialisms which mean different things: Christian Broadcasting Network in the case of petitioner's CBN mark; and Alto Broadcasting Network and Chronicle Broadcasting Networking in the case of respondent's ABS-CBN mark. Respondent's argument fails because the corporate names are not part of either party's registrations, and moreover there is no evidence that respondent uses its ABS-CBN mark in proximity to the underlying corporate name. In fact, the purported underlying corporate name is no longer in use as the testimony shows that respondent, ABS-CBN International, is a wholly-owned subsidiary of ABS-CBN Broadcasting Corporation. Accordingly, there is nothing of record to establish that the public is even aware of the underlying derivation of respondent's mark. *Hercules Inc. v. National Starch & Chemical Corp.,* 223 USPQ 1244, 1248 (TTAB 1984) ("in the absence of evidence establishing that purchasers would be aware of the term or terms from which the marks were derived, how the marks came to be adopted is immaterial to the issue whether confusion is likely from their contemporaneous use").

Because of the fame of petitioner's CBN mark, consumers familiar with petitioner's CBN mark and television broadcasting services would likely associate respondent's

ABS-CBN mark in some way with CBN, and may mistakenly believe that ABS-CBN is a division of CBN. Even though respondent's mark includes the additional letter string "ABS," the marks create a similar commercial impression. *Hewlett-Packard Co. v. Packard Press, Inc.,* 281 F.3d 1261, 62 USPQ2d 1001, 1004 (Fed. Cir. 2002)(holding that PACKARD TECHNOLOGIES and HEWLETT PACKARD differ in appearance and sound, but the marks convey a similar commercial impression because consumers would be aware of Hewlett-Packard's heavy involvement in technology-based goods, and therefore the marks are similar in their entireties).

Finally, respondent's argument that the marks are not similar because consumers have become accustomed to differentiating between television networks is also not persuasive. Respondent references the coexistence of ABC/NBC and TBS/CBS to support its argument. However, in those cases, the relevant three letter abbreviations are different, whereas in the case *sub judice,* the relevant three-letter abbreviation (CBN) is identical.

While the marks are not identical, we find that they are similar in sound, appearance, meaning, and commercial impression, and that the similarities in the marks outweigh their differences. In view of the foregoing, the similarity of the marks is a factor that favors finding that there is a likelihood of confusion.

G.  <u>The number and nature of similar marks in use on similar goods</u>.

Petitioner is unaware of any third-party use of CBN in connection with television broadcasting services or entertainment services.[61]  Respondent has not introduced any evidence of third-party use of the mark CBN.  Instead,

---

[61] Little Dep., pp. 59-66.

respondent contends that broadcasters commonly use three letter trademarks, that the letters "BN" are commonly used and understood to mean "Broadcasting Network," and that ABC, CBS, NBC, CNN, and TBN are broadcasting service marks that are similar to CBN.[62]  Even assuming television viewers have little difficulty distinguishing between similar letter marks for broadcasting services (*e.g.,* ABC v. NBC, TBS v. CBS, etc.), those marks differ in their initial letter, whereas the common portion of the marks at issue share the identical C-B-N letter combination.[63]  In view of the foregoing, there is no evidence of third-party use of similar marks that would minimize the strength of petitioner's mark.

H.    The nature and extent of any actual confusion and the length of time during and conditions under which there has been concurrent use without any evidence of actual confusion.

There have been no reported instances of confusion.[64] To determine whether the absence of actual confusion is relevant, we must consider the length of time and conditions under which the parties have concurrently used their marks without any reported instances of confusion.

---

[62] Respondent's Brief, p. 18.
[63] We note that respondent's mark differs by the three different initial letters "ABS."  However, as discussed *supra,* the similarities of the marks outweigh the differences.
[64] Turver Dep., pp. 38-39; Petitioner's Brief, p. 17; Santisteban Dep., p. 28; Lopez Dep., pp. 36-37.

The parties have concurrently used their marks in commerce since 1994. In fact, since 2000 or 2001, CBN Asia has broadcasted for one hour every Sunday on respondent's The Filipino Channel in the United States. Under this arrangement, the marks of the parties have appeared on successive screen shots.

Petitioner contends that the reason there have not been any reported instances of confusion is because the consumers involved in this case are watching television, and television viewers have no motivation to complain or to report their confusion.[65]

We do not consider it plausible that actual confusion may have occurred but has gone unreported because the confused person has no motivation to complain. The broadcasting services of both parties include news and commentary. Petitioner's programming in particular includes news and commentary regarding, *inter alia*, religion and politics.[66] Religion and politics can be controversial. Such controversial topics would naturally lead some viewers

---

[65] Turver Dep., pp. 38-40; Petitioner's Brief, p. 17.

[66] Petitioner's Exhibits 17-23. An example of a controversial topic featured by petitioner is a July 13, 2000 press release promoting the interviews with John and Patsy Ramsey, the parents of six-year-old JonBenet Ramsey who was found murdered in her Colorado home. That two-part interview was scheduled for the July 19, 2000 and July 20, 2000 broadcasts on THE 700 CLUB. In a June 29, 2001 press release, petitioner promoted an interview with Israeli Prime Minister Ariel Sharon regarding the turmoil in the Middle East. That interview was scheduled for broadcast during the week of July 3, 2001.

to call and express their satisfaction or dissatisfaction with the stories or commentaries. People do not hesitate to express their opinions as demonstrated by letters to the editor in magazines and newspapers, as well as listeners of radio talk shows who call-in to express their views. In fact, THE 700 CLUB generates 11,000 calls per day, and this format that encourages calls presents an excellent opportunity for viewers to express any confusion. Thus, we would expect the parties' viewers to call or write to express their views about controversial subjects (some of which may have been broadcast on the other party's television programs) and any instances of confusion. Nevertheless, there have been no reported instances of confusion.

Where, as here, there has been considerable activity by the parties under their respective marks over a long period of time (*i.e.,* since 1994) without any reported instances of confusion, one may infer that simultaneous use of the marks is not likely to cause confusion. *Haveg Industries, Incorporated v. Shell Oil Company,* 199 USPQ 618, 626 (TTAB 1978). Although petitioner argues that proof of actual confusion is not necessary to show that there is a likelihood of confusion, its absence in this case tends to reinforce the lack of a likelihood of confusion.

In view of the foregoing, the lack of actual confusion is a factor that weighs against finding likelihood of confusion.

I. Balancing the factors.

1. Broadcasting services.

Although there have been no reported instances of actual confusion, actual confusion is only one likelihood of confusion factor to be considered. The similarities of the marks, the services, the channels of trade, and classes of television viewers are sufficient to persuade us that the use of ABS-CBN for "television broadcasting services via satellite and cable" so closely resembles the mark CBN for "television broadcasting services" as to be likely to cause confusion.

2. Telephone calling card services.

While CBN is a famous mark, at least insofar as it pertains to television broadcasting services and evangelical services, its "fame" is insufficient in and of itself to establish a likelihood of confusion for any and all goods and services under Section 2(d) of the Lanham Act, 15 U.S.C. §1052(d). *Recot Inc. v. M.C. Becton, supra,* 54 USPQ2d at 1898; *University of Notre Dame du Lac v. J. C. Gourmet Food Imports Co., supra.* As indicated previously, there must be a reasonable basis for the public to associate respondent's telephone calling card services with petitioner and its CBN

31

service mark. *University of Notre Dame du Lac v. J. C. Gourmet Food Imports Co., supra.  See also Dymo Industries, Inc. v. Schramm, Inc., supra*; *American Optical Corporation v. Autotrol Corporation, supra*.  "The 'famous mark' argument is less persuasive where, as here, . . . there is no persuasive rationale asserted nor evidence offered to support a finding that the famous mark would likely be associated in the minds of purchasers with the mark challenged."  *Land O'Lakes, Inc. v. Land O'Frost, Inc.*, 224 USPQ 1022, 1026-1027 (TTAB 1984).  In this case, the services at issue are distinctly different and there is no proof of any relationship between the services.

With respect to respondent's telephone calling card services, petitioner relies on the fame of its CBN service mark in connection with television broadcasting services to support likelihood of confusion.  Petitioner makes the following argument:

> Because a likelihood of confusion exists between the parties' respective uses of their marks with television broadcasting services, Respondent's use of the mark ABS-CBN in connection with "telephone calling card services" also creates a likelihood of confusion.  Certainly a viewer who is familiar with Petitioner's famous mark CBN, and who is confused as to the source of Respondent's ABS-CBN television broadcasts, is also likely to be confused as to the source of any ABS-CBN "telephone calling card services."[67]

---

[67] Petitioner's Brief, p. 22.

With respect to respondent's telephone calling card services and any of petitioner's services, there is no evidence regarding the similarity of the services, or the channels of trade. There is no evidence regarding any interplay or relationship between respondent's telephone calling card services and any of petitioners' services that creates a situation from which confusion arises.

In the context of telephone calling card services, the use of the mark ABS-CBN is sufficiently different from CBN to distinguish the source of the services. *See Real Estate One, Inc. v. Real Estate 100 Enterprises Corporation*, 212 USPQ 957, 959 (TTAB 1981) (the degree of similarity in the respective marks necessary to find likelihood of confusion is less when services of parties are same and are directly competitive than if services were not same). Accordingly, with respect to respondent's telephone calling card services, we find that the differences between the parties' services and the marks under which they are sold more than offset the fame of petitioner's CBN service mark and, therefore, serve to negate any likelihood of confusion. *Federated Foods, Inc. v. Fort Howard Paper Co.,* 544 F.2d 1098, 192 USPQ 24, 29 (CCPA 1976)("The fundamental inquiry mandated by §2(d) goes to the cumulative effect of differences in the essential characteristics of the goods and differences in the marks").

In reaching this conclusion, we are cognizant of the decisions of our reviewing court in *Recot Inc. v. M.C. Becton, supra* and *Kenner Parker Toys Inc. v. Rose Art Industries Inc., supra*.  In *Recot*, the Board failed to consider the testimony of both parties' witnesses that several companies produce and sell both pet and human foods. In this case, however, there is no evidence that any company other than respondent renders telephone calling card services and television broadcasting services (let alone that any companies render such services under the same or similar marks).  Nor is there any other credible evidence that telephone calling card services and television broadcasting services or evangelical services are related in the mind of the consuming public as to the origin of the services.

In *Kenner Parker Toys,* the Court said that the Board incorrectly reasoned that because opposer's mark was famous, consumers would more easily recognize the differences between the marks and, therefore, incorrectly concluded that fame permitted greater, rather than less, tolerance for similar marks.  This skewed the analysis of the *du Pont* factors.  *Kenner Parker Toys* involved identical products, modeling compounds and related modeling accessories, while this case involves disparate services.

In view of the foregoing, we find that respondent's mark ABS-CBN, when used in connection with "telephone calling card services," does <u>not</u> so resemble CBN for any of petitioner's services as be likely to cause confusion, to cause mistake, or to deceive.

## Laches and acquiescence

By statute, laches and acquiescence are available as affirmative defenses.  Section 19 of the Lanham Act, 15 U.S.C. §1069.

A.  <u>Laches</u>

In order to prevail on its affirmative defense of laches, respondent is required "to establish that there was undue or unreasonable delay [by petitioner] in asserting its rights, and prejudice to [respondent] resulting from the delay."  *Bridgestone/Firestone Research Inc. v. Automobile Club de l'Ouest de la France,* 245 F.3d 1359, 58 USPQ2d 1460, 1462-1463 (Fed. Cir. 2001).  *See Lincoln Logs Ltd. v. Lincoln Pre-Cut Log Homes Inc.,* 971 F.2d 732, 23 USPQ2d 1701, 1703 (Fed. Cir. 1992).  The laches defense, if successful, will serve as a bar against a petition for cancellation grounded on likelihood of confusion unless confusion is inevitable.  *See Reflange Inc. v. R-Con International,* 17 USPQ2d 1125, 1131 (TTAB 1990) (equitable defenses such as laches and acquiescence would not preclude

35

a judgment for plaintiff if it is determined that confusion is inevitable); *Feed Flavors Inc. v. Kemin Industries, Inc.,* 214 USPQ 360, 364 (TTAB 1982).

The registration sought to be canceled, Registration No. 2,334,131, issued on March 28, 2000. Petitioner filed the petition for cancellation on March 24, 2005 - - nearly five years after registration. In addition, in either 2000 or 2001, CBN Asia, petitioner's subsidiary, contracted with respondent to broadcast on The Filipino Channel for one hour every Sunday. Petitioner has offered no explanation for its delay in filing the petition for cancellation even though petitioner claims to actively police its marks.[68]

In the absence of actual notice before the close of the opposition period, the date of registration is the operative date for calculating laches. *Teledyne Technologies, Inc. v. Western Skyways, Inc.,* 78 USPQ2d 1203, 1210 (TTAB 2006), *aff'd unpublished opinion,* Appeal Nos. 2006-1366 and 1367 (Fed. Cir. Dec. 6, 2006). Accordingly, petitioner was put on constructive notice of respondent's trademark as of March 28, 2000, the registration date, and had actual notice of respondent's use of the mark at least as early as 2001 in view of its contracting with respondent via its subsidiary CBN Asia.[69] The petition for cancellation was filed on

---

[68] Little Dep., pp. 59-65; Petitioner's Brief, pp. 20-21.
[69] There is nothing in the record to indicate that petitioner had actual notice of the registration or respondent's use of the mark

March 24, 2005, thereby making the length of petitioner's delay in filing the petition just 4 days short of five years.

The length of delay between notice and filing a petition for cancellation is a factor when considering a laches defense. *Teledyne Technologies, Inc. v. Western Skyways, Inc., supra* at 1210 (3 years, 8 months of unexplained delay held sufficient for laches). In the context of this case, we find that the almost five-year period of delay between the issuance of the registration and the filing of the petition for cancellation constitutes undue or unreasonable delay. We find this based on petitioner's actual knowledge of respondent's use of its mark by virtue of petitioner contracting with respondent to broadcast on its network shortly after the ABS-CBN mark registered and petitioner's testimony that it purportedly actively policed its mark.

We find petitioner's argument that it was not aware of respondent's use of the mark in the United States implausible. Since petitioner was broadcasting on respondent's network, the marks of the parties often appeared on successive screen shots. Under such

---

prior to March 28, 2000. Mr. Lopez's testimony that in or around 2000 or 2001, CBN Asia contracted for an hour of broadcasting time every Sunday on The Filipino Channel is too indefinite to establish petitioner's actual notice prior to March 28, 2000.

circumstances, petitioner knew or should have known of respondent's use of ABS-CBN in the United States.

In addition, television producers or broadcasters use letter marks to identify their services (*e.g.,* CBS, CNN, ABC, ESPN, and KTSF).[70]  Respondent used the call letters ABS-CBN on its broadcasts in the United States.  As mentioned above, since 2001, petitioner's programming has appeared on respondent's network in the United States.  Under such circumstances, it is reasonable to infer that petitioner would have ensured that its programming was, in fact, being broadcast on respondent's network, and petitioner would have seen respondent's logo including the ABS-CBN service mark.  Thus, petitioner knew or should have known of respondent's use of the ABS-CBN service mark.

In view of the foregoing, we find that petitioner's delay of almost five years in filing the petition for cancellation was unreasonable.

With respect to respondent's prejudice caused by petitioner's delay, petitioner argues that laches does not apply because respondent has not proven any actual harm caused by petitioner's delay in filing the petition for cancellation.[71]  Prejudice, however, may be as simple as the development of goodwill built around a mark during petitioner's delay.

---

[70] Lopez Dep., p. 28.

Cancellation No. 92044366

> Prejudice is generally shown by the fact
> that in reliance on petitioner's
> silence, respondent built up a valuable
> business and goodwill around the mark
> during the time petitioner never
> objected.  [Citation omitted].

*Alfacell Corp. v. Anticancer Inc.,* 71 USPQ2d 1301, 1307

(TTAB 2004).

Respondent's reliance on petitioner's delay in filing a

petition for cancellation is not a requirement for laches.

In other words, petitioner does not have to overtly or

covertly lull respondent into believing that petitioner

would not act.  "Economic prejudice arises from investment

in and development of the trademark, and the continued

commercial use and economic promotion of a mark over a

prolonged period adds weight to the evidence of prejudice."

*Teledyne Technologies Inc. v. Western Skyways Inc., supra* at

1211.  *See also Trans Union Corp. v. Trans Leasing*

*International, Inc.,* 200 USPQ 748, 756 (TTAB 1978)(prejudice

occurs where senior user takes action after the junior user

builds up its business and goodwill around a mark).

The record shows that respondent has continued

the use, economic promotion, and development of the ABS-CBN

service mark during the period of petitioner's delay.

Respondent's total number of subscribers has grown to

200,000.  In 2005, after the number of satellite subscribers

grew to 80,000, respondent changed its business model from

---

[71] Petitioner's Brief, pp. 6-8.

independently administering a direct-to-home satellite network to contracting with DirecTV for a premium subscription service. Respondent's satellite distribution network thereby grew from its 300-400 dealers to DirecTV's 70,000 dealers.[72] Thus, there has been detriment to respondent due to the delay.

In view of the foregoing, respondent has established a laches defense against petitioner's likelihood of confusion claim.

B. Acquiescence

Acquiescence is a type of estoppel that is based upon the plaintiff's conduct that expressly or by clear implication consents to, encourages, or furthers the activities of the defendant, that is not objected to. *Hitachi Metals International v. Yamakyu Chain Kabushiki,* 209 USPQ 1057, 1067 (TTAB 1981); *CBS, Inc. v. Man's Day Publishing Co., Inc.,* 205 USPQ 470, 473-474 (TTAB 1980). *See also Coach House Restaurant Inc. v. Coach and Six Restaurants Inc.,* 934 F.2d 1551, 19 USPQ2d 1401, 1404 (11th Cir. 1991). A plaintiff will not be permitted to stop conduct that it fostered or tolerated, where the result would be prejudicial to the defendant. *Id.* Based on the record in this case, there is no doubt that petitioner had full knowledge of respondent's activities by virtue of the

---

[72] Lopez Dep., pp. 16-18; Santisteban Dep., pp. 11-12, 15.

fact that it contracted with respondent to broadcast its programming over respondent's network.  As a result, the ABS-CBN and CBN service marks often appear on successive screen shots.  Petitioner never expressed any dissatisfaction or displeasure to respondent regarding its use of the ABS-CBN service mark.  In view of the foregoing, petitioner's silence constitutes acquiescence regarding respondent's use of the ABS-CBN service mark.

C.   Confusion is not inevitable

Our findings that petitioner's delay in bringing this opposition constitutes laches and that petitioner's silence regarding respondent's use of the ABS-CBN mark constitutes acquiescence leads to the question of whether the likelihood of confusion arising from broadcasting services rendered by the parties under the marks CBN and ABS-CBN, respectively, is inevitable as urged by petitioner or reasonably debatable as argued by respondent.  In cases such as this, where equitable defenses have been pleaded and proved, it is necessary to decide whether the question of likelihood of confusion is inevitable or reasonably debatable because the equitable defenses of laches and acquiescence are barred if confusion is inevitable. *Ultra-White Co., Inc. v. Johnson Chemical Industries, Inc.,* 465 F.2d 891, 175 USPQ 166, 167 (CCPA 1972); *Reflange Inc. v. R-Con International, supra; Hitachi Metals International v. Yamakyu Chain Kabushiki,* 209

USPQ 1057, 1069 (TTAB 1981). This is so because any injury to respondent caused by plaintiff's delay is outweighed by the public's interest in preventing confusion. *Turner v. Hops Grill & Bar, Inc.,* 52 UPSQ2d 1310, 1313 (TTAB 1999), *citing Coach House Restaurant Inc. v. Coach and Six Restaurants, Inc.,* 934 F.2d 1551, 19 UPSQ2d 1401, 1409 (11th Cir. 1991).

Although we found that there is a likelihood of confusion between petitioner's CBN mark for television broadcasting services and respondent's mark ABS-CBN for television broadcasting service by cable and satellite, we also find that the evidence of record does not establish that confusion is inevitable.

In the present case, the television broadcasting services are virtually identical. The marks, however, are not identical. Respondent's mark includes the prefix ABS before CBN thereby making it a six-letter mark which according to the testimony is unusual in the broadcasting field. In addition, there has been 13 years of concurrent use of the marks under similar marketing circumstances without any reported instances of actual confusion. For these reasons, we do not view confusion between the parties' marks as inevitable.

Decision: Respondent's mark ABS-CBN for "telephone calling card services" does not so resemble petitioner's

mark CBN for petitioner's various services as to be likely to cause confusion.

Respondent's mark ABS-CBN for "television broadcasting services via satellite and cable" so closely resembles petitioner's CBN mark for "television broadcasting services" as to be likely to cause confusion.  However, respondent's affirmative defenses of laches and acquiescence are applicable and, thus, petitioner's likelihood of confusion claim must be dismissed.

The petition for cancellation is dismissed.