This Opinion is a
Precedent of the TTAB

Mailed: April 24, 2018

UNITED STATES PATENT AND TRADEMARK OFFICE

————

Trademark Trial and Appeal Board

————

*TPI Holdings, Inc.*
v.
*TrailerTrader.com, LLC and Trailer Central LLC*

————

Cancellation No. 92064976

————

Christopher P. Bussert and Harris W. Henderson of Kilpatrick Townsend & Stockton LLP for
 TPI Holdings, Inc.

David L. Oppenhuizen of Oppenhuizen Law PLC, and Terence J. Linn and Karl T. Ondersma of Gardner, Linn, Burkhart & Flory, LLP for
 TrailerTrader.com LLC and Trailer Central LLC.

————

Before Wellington, Lykos and Hightower,
 Administrative Trademark Judges.

Opinion by Wellington, Administrative Trademark Judge:

TPI Holdings, Inc. ("Petitioner") seeks to cancel a registration on the

Supplemental Register owned by Trailer Central LLC ("Respondent") for the

standard character mark **TRAILERTRADERS.COM** for:

> Preparing and placing advertisements for others in the field of trailers, trailer parts and trailer accessories all via the internet; providing

consumer information and related news in the field of trailers, trailer parts, trailer accessories and trailer dealers; providing trade information in the field of trailers, in International Class 35.

Respondent was joined as a party defendant after it acquired the registration from TrailerTrader.com LLC ("TrailerTrader") by assignment.[1]

As grounds for cancellation, Petitioner alleges a likelihood of confusion under Section 2(d) of the Trademark Act, 15 U.S.C. § 1052(d), with its asserted "family" of marks containing the term TRADER. Specifically, Petitioner pleads ownership of 28 registered marks with the term TRADER in connection with magazines or advertising services for vehicles and other goods, including the following: AERO TRADER (Reg. No. 2288805); ATV TRADERONLINE.COM (Reg. No. 2868892); AUTOTRADER (Reg. No. 2381590); AUTOTRADER.COM (stylized with design, Reg. No. 3449402); BARGAIN TRADER (Reg. No. 2294228); BOAT & RV TRADER (Reg. No. 1450690); BOAT TRADER (Reg. No. 2389118); BOAT TRADERONLINE.COM (Reg. No. 2873930); COMMERCIAL TRUCK TRADER (Reg. No. 3605107); CUSTOM, ANTIQUE & SPORTSCAR TRADER (Reg. No. 1872467); CYCLE TRADER (Reg. No. 1627016); CYCLE, BOAT & RV TRADER (Reg. No. 1450707);

---

[1] The involved Registration No. 4231602 issued on the Supplemental Register to TrailerTrader.com LLC on October 23, 2012. On February 25, 2017, after the institution of this proceeding but before an answer was filed, the registration was assigned to Trailer Central LLC (recorded with the Assignment Branch of the Office on March 2, 2017 at Reel/Frame 6000/0664). On August 18, 2017, the Board joined Trailer Central LLC as a party defendant (13 TTABVUE).

Both companies are defendants and technically respondents in this proceeding. However, for sake of clarity in this decision, TrailerTrader.com LLC is referred to as "TrailerTrader" and Trailer Central LLC as "Respondent."

EQUIPMENT TRADER (Reg. No. 3605275); RV TRADER (Reg. No. 2294239); SAILBOATTRADERONLINE.COM (Reg. No. 3208475); and YACHT TRADER (Reg. No. 2349954).

Petitioner also alleges it is the owner of the mark TRAILERTRADER.COM and that this mark was first used by Petitioner's predecessor-in-interest in 2005; that it filed a federal application to register the mark TRAILER TRADER (Serial No. 86910905) for services that include "providing a website and an online searchable database featuring advertisements for trailers" and this application has been refused registration based on Respondent's registration;[2] that "beginning in the 1970s, Petitioner's predecessors-in-interest and/or their licensees, used the mark TRADER in connection with printed publications featuring classified advertising relating to a wide variety of vehicles";[3] that "through its licensees, [Petitioner] has continued to use and expand its family of TRADER marks for printed publications and online web sites featuring advertising services and classified advertising for others relating to a wide variety of vehicles";[4] that its marks "have been and are advertised and marketed together in such a manner as to create public recognition coupled with an association of common origin predicated upon the common family feature TRADER";[5] and "Registrant's mark falsely suggests a connection with Petitioner, and is also likely to cause confusion, mistake and deception, and to create the erroneous impression that

---

[2] 1 TTABVUE 13.

[3] *Id.* at 12.

[4] *Id.*

[5] *Id.* at 14.

Registrant's TRAILERTRADERS.COM services are those of Petitioner or are otherwise affiliated with Petitioner and its family of TRADER Marks."[6]

In its answer, Respondent admitted that Petitioner is the owner of pleaded application Serial No. 86910905; that the USPTO refused registration of this application based on Respondent's registration; and that "the services associated with [Respondent's registration] are closely related and identical to the services identified in the Petitioner's [pleaded application]."[7] Respondent otherwise denied the remaining salient allegations in the petition for cancellation.

Respondent also asserted in the answer, as affirmative defenses, that "[Petitioner] is precluded from cancellation of Registrant's Mark under the Doctrines of Laches, Estoppel, Acquiescence and Waiver."[8]

## I.    Parties' Adoption of Accelerated Case Resolution (ACR)

On June 6, 2017, after the deadline for the parties' initial disclosures but before the deadline for expert disclosures, the parties filed a "Stipulation as to the Use of Accelerated Case Resolution" ("ACR stipulation"), and the Board approved this ACR stipulation the following day.[9] By way of the ACR stipulation, the parties agreed to the following:

- The parties agree to a summary bench trial procedure through summary judgment-type briefs. The parties agree that, in lieu of trial, the Board may

---

[6] *Id.* at 16.

[7] 8 TTABVUE 3 (Answer ¶¶ 11-12).

[8] *Id.* at 3.

[9] 12 TTABVUE (parties' ACR stipulation) and 13 TTABVUE (Board order approving ACR stipulation).

resolve on the papers any and all issues of material fact that may be presented in making a final determination on the merits.

- Limitations to written discovery, with each party serving a maximum of fifteen (15) interrogatories, fifteen (15) requests for production and fifteen (15) requests for admission.

- Allowance of testimony through affidavit or declaration, including the submission as attachments or exhibits to affidavits, declarations or briefs any materials that, in a typical trial, could be submitted by Notice of Reliance.

- No objections as to the authenticity or admissibility of the affidavits, declarations, documents, exhibits and discovery deposition testimony so long as the declarant or affiant establishes that he or she has knowledge of the facts presented.

- Discovery responses and documents produced in discovery may be submitted as exhibits without the need for accompanying testimony, but the parties may still contest the relevancy, materiality or weight of the evidence. The parties agree that all documents produced in response to a Request for Production of Documents shall be deemed authentic business records.

- An abbreviated discovery period.

- A schedule for the filing of ACR "opening briefs" by each party, as well as "rebuttal briefs" to be filed by each party, with page limitations (30 pages for the opening briefs, and 10 pages for the rebuttal briefs).

- Waiver of oral argument following the submission of their briefs.

The parties' decision to adopt ACR comes in the wake of the January 2017 amended Trademark Rules affecting Board practice. Many of the new rules were adopted with an eye towards allowing smoother and more efficient inter partes proceedings.[10] In amending the rules, "[t]he Board also looked back on its multi-year

---

[10] *See* Miscellaneous Changes to Trademark Trial and Appeal Board Rules, 81 Fed. Reg. 69950, 69950 (October 7, 2016) (Notice of Final Rulemaking) (amending rules "to benefit the public by providing for more efficiency and clarity in inter partes and ex parte proceedings").

campaign to promote the use of ACR, to determine lessons learned, and to identify ways to leverage the benefits of ACR into all Board trial cases."[11] Nevertheless, the Board recognizes that there certainly remains room for parties to agree to go beyond the rules, and to craft an ACR stipulation that suits their interests. *See* Trademark Trial and Appeal Board Manual of Procedure ("TBMP") § 528.05(a)(2) (June 2017) ("Parties to Board inter partes proceedings may stipulate to pretrial final disposition on the merits (as well as abbreviated trial on the merits, see TBMP § 702) of inter partes cases via Accelerated Case Resolution (ACR)."). Indeed, while the circumstances of each inter partes proceeding are unique, parties are encouraged to continue to explore whether ACR is appropriate given those circumstances and, if so, attempt to stipulate to provisions that suit the parties' particular interests and accelerates the timing for a Board final decision in the matter. More information about the Board's ACR options can be found on the Board's website.[12]

## II. Evidentiary Record

With its opening brief, and in accordance with the parties' ACR stipulation, Petitioner submitted the following:

- Declaration of Lori Stacy, CEO for Trader Interactive, LLC and Petitioner's Secretary ("Stacy Declaration"), with exhibits;[13]

- Exhibits to Petitioner's opening brief;[14]

---

[11] *Id.* at 69952-53.

[12] *See* www.uspto.gov/ttab.

[13] 15-16 TTABVUE.

[14] 17-18 TTABVUE (including exhibits involving Petitioner's "profit and loss" statements that have been designated "confidential").

- Declaration of Joseph V. Burns, a paralegal employed by Petitioner's counsel ("Burns declaration"), with exhibits;[15] and

- Copies of Respondent's responses to Petitioner's interrogatories.[16]

With its opening brief, Respondent submitted the following:

- Declaration of Joshua D. Slabaugh, co-founder and member of TrailerTrader and Respondent ("Slabaugh Declaration"), with exhibits;[17]

- Confidential profit and loss statements;[18]

- Second declaration of Mr. Slabaugh ("Slabaugh Declaration II"), with exhibits;[19]

- Copies of third-party registrations and materials showing use of marks containing the term TRADER;[20]

- Printouts from dictionaries containing the definition of the terms "trader" and "trailer";[21]

- Petitioner's responses to Respondent's interrogatories and requests for admission;[22] and

- Printout of "2016 Minnesota Statutes," including a section addressing "Reinstatement" after a limited liability company is "administratively terminated."[23]

---

[15] 19 TTABVUE.

[16] 20 TTABVUE.

[17] 23 TTABVUE.

[18] 24 TTABVUE.

[19] 25 TTABVUE.

[20] 26-28 TTABVUE.

[21] 28 TTABVUE (Exhibits C76-C78).

[22] 29 TTABVUE.

[23] 29 TTABVUE (Exhibit F).

With its rebuttal brief, Petitioner submitted a supplemental declaration of Ms. Stacy ("Stacy Declaration II") and Mr. Burns ("Burns Declaration II"), with exhibits.[24]

Respondent, with its rebuttal brief permitted under the parties' ACR stipulation, filed a third declaration of Mr. Slabaugh ("Slabaugh Declaration III"), with exhibits,[25] and other exhibits under a notice of reliance.[26]

Accordingly, the issues for resolution in this case are: (1) Petitioner's standing, (2) Respondent's laches affirmative defense, and, if Respondent's laches affirmative defense is granted, and (3) whether confusion between Petitioner's TRADER family of marks and Respondent's mark **TRAILERTRADERS.COM** is nevertheless inevitable, the public interest against which would override any laches. We decide these issues in order.

### III.    Petitioner's Standing

Petitioner is the owner of an intent-to-use application for the mark TRAILER TRADER for, inter alia, advertising services and an online marketplace featuring trailers, and this application "was refused on June 9, 2016, based on the [involved registration], owned by [TrailerTrader] and assigned in 2017 to [Respondent]."[27] This undisputed fact, alone, establishes Petitioner's standing. *See Empresa Cubana del*

---

[24] 30 TTABVUE and 31 TTABVUE (designated "confidential" copy).

[25] 33 TTABVUE.

[26] 34 TTABVUE.

[27] 15 TTABVUE (Stacy Declaration ¶ 43).

*Tabaco v. General Cigar Co.*, 111 USPQ2d 1058, 1062 (Fed. Cir. 2014) (plaintiff's application refused based on defendant's registrations); *Saddlesprings Inc. v. Mad Croc Brands Inc.*, 104 USPQ2d 1948, 1950 (TTAB 2012) (standing adequately alleged by allegation that petitioner's intent-to-use application has been refused based on respondent's registrations); *ShutEmDown Sports Inc. v. Lacy*, 102 USPQ2d 1036, 1041 (TTAB 2012) (evidence of record showing petitioner's pending application refused registration based on respondent's registration).

IV.    **Laches Defense**

The equitable principle of laches is available as an affirmative defense that may be raised in answer to a cancellation proceeding based on likelihood of confusion. Trademark Act Section 19, 15 U.S.C. § 1069; Trademark Rule 2.106(b)(2), 37 C.F.R. § 2.106(b)(2); TBMP § 311.02(b). As noted *supra*, Respondent pleaded laches as an affirmative defense[28] and, in its trial brief, Respondent pursued this defense in arguing that Petitioner's likelihood of confusion claim is barred because Petitioner "had actual knowledge" of Respondent's, or TrailerTrader's (as Respondent's predecessor-in-interest), use of the involved mark since at least as early as late 2010; that Respondent "has invested significant economic resources by attending trade shows and working with trailer manufacturers and dealers to grow and develop the

---

[28] Respondent also asserted "estoppel, acquiescence and waiver," but does not argue any of these in its brief. They are therefore waived. *See, e.g.*, *Tao Licensing, LLC v. Bender Consulting Ltd.*, 125 USPQ2d 1043, 1046 (TTAB 2017).

brand"; and that Respondent has "suffered economic prejudice from the unreasonable delay in bringing this [cancellation]."[29]

The elements of a laches defense are: (1) unreasonable delay in assertion of one's rights against another; and (2) material prejudice to the latter attributable to the delay. *See Lincoln Logs Ltd. v. Lincoln Pre-Cut Logs Homes Inc.*, 971 F.2d 732, 23 USPQ2d 1701, 1703 (Fed. Cir. 1992). The party raising the affirmative defense, Respondent in this case, has the burden of proving it. *See Bridgestone/Firestone Research Inc. v. Automobile Club de l'Ouest de la France*, 245 F.3d 1359, 58 USPQ2d 1460, 1462 (Fed. Cir. 2001). As the Federal Circuit's predecessor put it, "[t]he registrant, of course, has the right to invoke the doctrine in a cancellation proceeding. ... [It], however, bears, the burden of showing the injustice." *Ralston Purina Co. v. Midwest Cordage Co.*, 373 F.2d 1015, 153 USPQ 73, 75-76 (CCPA 1967).

As to when a laches period for any unreasonable delay begins to run in a cancellation proceeding, we look to the timing of a petitioner's awareness of the registration, or underlying application. In this respect, there are key differences between registrations on the Supplemental Register, like the one involved in this proceeding, and those on the Principal Register.[30] These differences have

---

[29] 22 TTABVUE 29-32.

[30] The "Supplemental Register" was created by Section 23 of the Lanham Act ("Trademark Act") in 1946, as "a continuation of the register provided in" the Trademark Act of 1920. 15 U.S.C. § 1091. As the current title for Section 23 ("Filing and registration for foreign use") suggests, this register was instituted in 1920 with the initial legislative intent "of enabling manufacturers to register their trade-marks in this country for the purpose of complying with legislation in foreign countries, which necessitates registration in the United States as a necessary preliminary for such foreign registration." *Armstrong Paint & Varnish Works v. Nu-Enamel Corp.*, 305 U.S. 315, 334 n.21 (1938) (citing S. Rep. No. 66-432, at 2 (1920)). However, even by 1961, this initial purpose, i.e., offering domestic companies an alternative

ramifications when calculating unreasonable delay in bringing a cancellation proceeding. First, applications for registration of marks on the Supplemental Register, in contrast to Principal Register applications, are not published for opposition in the Official Gazette. Trademark Act Section 24, 15 U.S.C. § 1092. Thus, it is not possible to file an opposition to an application to register a mark on the Supplemental Register. Second, although the issuance of a registration on the Supplemental Register is published in the Official Gazette, this does not give constructive notice of a claim of rights in the mark. *Loma Linda Food Co. v. Thompson & Taylor Spice Co.*, 279 F.2d 522, 126 USPQ 261, 263 (CCPA 1960) ("It is evident … that the Lanham Act does not contemplate that [ ] registrations on the

---

route to registration of marks for protection in other countries, was regarded as somewhat outdated. *See* Palmatier testimony at p. 16 of transcript from hearing "Registration and Protection of Trademarks" (Bill Nos. 86 S. 2429; 87 H.R. 4333) ("Actually, at the present time in most foreign countries, you do not have to show a U.S. registration."). Nevertheless and in spite of this antiquated origin, the Supplemental Register survives and still allows for the registration of marks that are not registrable on the Principal Register but are "capable of distinguishing" goods or services. Trademark Act Section 23, 15 U.S.C. § 1091. The law is also clear that registration on the Supplemental Register does not preclude eventual registration on the Principal Register; nor is it an admission that the mark has not acquired distinctiveness. Trademark Act Section 27, 15 U.S.C. § 1095. Indeed, there are several benefits to ownership of a Supplemental Registration unrelated to registration of the same mark overseas. For example, owners of Supplemental Registrations may give notice of registration to others by use of the ® symbol. Trademark Act Section 29, 15 U.S.C. § 1111. Moreover, while registrations on the Supplemental Register "shall not be subject to or receive the advantages of" several sections of the Act, in at least the *ex parte* context, the provisions of Section 2(d) of the Act apply to registrations on the Supplemental Register, and therefore, "a mark registered on the Supplemental Register can be used as a basis for refusing registration to another mark under § 2(d) of the Act." *In re Clorox Co.*, 578 F.2d 305, 198 USPQ 337, 340 (CCPA 1978). In other words, the owner of a Supplemental Register registration can rely on the Office to cite its registered mark against any other applied-for mark that the Office deems confusingly similar. In an *inter partes* proceeding like this one, a plaintiff may also use the registration for purposes of establishing its standing to bring an opposition to an applicant's mark based on a likelihood of confusion. *Otter Prods. LLC v. Baseonelabs LLC*, 105 USPQ2d 1252, 1254 (TTAB 2012).

supplemental register … shall constitute constructive notice of the registrant's claim of ownership."). In contrast, the date of registration for marks on the Principal Register does serve to put others on notice "of the registrant's claim of ownership" of the mark under Trademark Act Section 22, 15 U.S.C. § 1072. Simply put, although both Supplemental and Principal registrations are published in the Official Gazette, constructive notice by way of registration only attaches to registrations on the Principal Register.[31]

Accordingly, in the context of a laches defense asserted in a cancellation proceeding involving a Supplemental registration and in calculating the amount of any unreasonable delay, we calculate notice by determining the date when the petitioner first had knowledge that the registration issued.[32] In this case, the involved registration issued on October 23, 2012, and Petitioner has admitted that "on or around October 29, 2012," counsel for Petitioner received notification of the registration's issuance.[33] Therefore, the date that laches begins to run in this proceeding is October 29, 2012.

---

[31] Indeed, Trademark Act Section 26, 15 U.S.C. § 1094, specifically instructs that "registrations on the supplemental register … shall not be subject to or receive the advantage[] of" the constructive notice provision of Section 22.

[32] With respect to a Principal Registration and calculating any period of any unreasonable delay for purposes of a laches defense in a cancellation proceeding, we look to the earlier of: (1) any time during the opposition period for which petitioner could have opposed the underlying application if the petitioner had prior, actual knowledge of defendant and its mark, or (2) the date of registration which, as described above, serves as constructive notice "of the registrant's claim of ownership" of the mark under Trademark Act Section 22, 15 U.S.C. § 1072. *Ava Ruha Corp. v. Mother's Nutritional Ctr., Inc.*, 113 USPQ2d 1575, 1580 (TTAB 2015); *Teledyne Tech. Inc. v. Western Skyways Inc.*, 78 USPQ2d 1203, 1210 n.10 (TTAB 2006); TBMP § 311.02(b).

[33] 15 TTABVUE; Stacy Declaration ¶ 67 ("On or around October 29, 2012, outside counsel for TPI received notification from its trademark monitoring service that the

Thus, the delay in this proceeding is nearly four years and two months, within the realm of time found to be sufficient for purposes of laches. *Ava Ruha Corp.*, 113 USPQ2d at 1580-81 (delay of three years and two months could support a laches defense); *Teledyne Tech. Inc. v. Western Skyways Inc.*, 78 USPQ2d at 1211 ("petitioner's delay of over three and one-half years, and the complete absence of any reasonable excuse for its inaction, constitutes undue delay prior to filing the petition for cancellation"); *see also* 3 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 20:76 (5th ed. March 2018) (regarding periods of delay found to constitute laches when coupled with sufficient prejudice to registrant). We keep in mind that, as described above, the elements of laches must be established; the mere passage of time does not constitute laches. *Fishking Processors Inc. v. Fisher Seafoods Ltd.*, 83 USPQ2d 1762, 1766 (TTAB 2007).

We begin our analysis by considering whether the more than four-year delay was unreasonable in this case. Although we must construe the period for laches in this case to start running as of October 29, 2012, the following timeline of relevant factual allegations begins earlier in order to provide necessary background:

- In July 2010, Messrs. Joshua Slabaugh and Gary Raak formed TrailerTrader, an LLC, to "develop and promote the www.trailertraders.com website as an online platform for buying and selling all manner of vehicle trailers, as well as assisting others in finding financing for the purchase of trailers, and assisting in finding trailer manufacturers and trailer service centers."[34] Messrs. Slabaugh and Raak remain TrailerTrader's only members.

---

TRAILERTRADERS.COM mark had been registered on the Supplemental Register.").

[34] 23 TTABVUE; Slabaugh Declaration ¶¶ 1-3.

- Since the formation of TrailerTrader, the mark TRAILERTRADERS.COM has been used prominently and continuously on the website www.trailertraders.com.[35]

- On October 19, 2010, TrailerTrader filed the underlying application that matured into the involved registration, as well as a second application (Serial No. 85118931) for the mark TRAILERTRADER.COM ("second application").[36]

- At least as early as December 8, 2010, Petitioner had actual knowledge of TrailerTrader's applications.[37]

- On April 18, 2011, Petitioner sent a letter to TrailerTrader demanding that it immediately cease use of the TRAILERTRADER.COM and TRAILERTRADERS.COM marks, among other measures ("cease and desist letter").[38]

- On April 28, 2011, counsel for TrailerTrader responded by letter to Petitioner's cease and desist letter, disputing Petitioner's assertions of any likelihood of confusion with any of Petitioner's marks and rejecting Petitioner's claimed exclusivity of the term "TRADER" and ownership of a "family of marks." TrailerTrader stated it would "not acquiesce to the actions" requested by Petitioner.[39]

- On June 7, 2011, Respondent was formed "to further expand the operations of the www.trailertraders.com website and the TRAILERTRADERS.COM trademark in association therewith."[40] Specifically, Respondent "operates by managing the online sales inventories for trailer dealers."[41]

---

[35] *Id.* at ¶¶ 4-6.

[36] 15 TTABVUE 658-660; Stacy Declaration exhibit 33 (Office electronic database TSDR printout for application Ser. No. 85118931 showing mark abandoned on September 20, 2012).

[37] *Id.* at 19 (Stacy Declaration ¶ 65).

[38] *Id.* (¶ 66); 23 TTABVUE 180-185 (Slabaugh Declaration exhibit A8 (copy of letter)).

[39] 23 TTABVUE; Slabaugh Declaration ¶ 17, and 23 TTABVUE 186-188; Slabaugh Declaration exhibit A9 (copy of response letter).

[40] *Id.* at 9-10; Slabaugh Declaration ¶ 25.

[41] As Mr. Slabaugh explained, "rather than updating postings on each website individually, dealers need only update their postings on the www.trailercentral.com website, which then updates each website on which the trailer dealer has postings. This includes websites such as eBay, Craigslist, HorseClicks and TrailersUSA, none of which are owned by [Petitioner]." *Id.* at ¶ 27.

- On August 3, 2012, TrailerTrader was "administratively dissolved" by the State of Minnesota for failure "to file an annual renewal."[42]

- On September 20, 2012, TrailerTrader's second application was abandoned by the Office.[43]

- On October 23, 2012, the involved registration issued and, "on or around October 29, 2012," counsel for Petitioner received notification of the registration issuance.[44]

- Between the time period of April 28, 2011 (date of Respondent's letter in response to Petitioner's cease and demand letter) and December 8, 2016 (filing of the petition for cancellation), there was no communication between the parties.[45]

Other pertinent factual allegations, for which no time frame has been given, include Petitioner's assertion that it conducted "further investigation" which "disclosed that [TrailerTrader] was administratively dissolved in August of 2012,"[46] and that Petitioner "learned that [TrailerTrader's second application] had been

---

[42] 23 TTABVUE; Slabaugh Declaration ¶ 29.

[43] *See* n.36 *supra*.

[44] 15 TTABVUE; Stacy Declaration ¶ 67.

[45] 23 TTABVUE Slabaugh Declaration ¶ 20 ("[n]o response from [Petitioner] to [TrailerTrader's letter] was ever received. I therefore understood that [Petitioner] likewise considered the matter resolved…"). Petitioner does not assert that it attempted to contact TrailerTrader or Respondent, or received any further communications therefrom, during this time period.

[46] 15 TTABVUE; Stacy Declaration ¶ 67. Although the statement "further investigation" follows a sentence in which Ms. Stacy avers that Petitioner learned of the issuance of the involved registration "on or around October 29, 2012," it is unclear if the "further investigation" was contemporaneous with that date or if the "further investigation" was conducted later, e.g., during discovery. Moreover, Mr. Slabaugh has testified, and Petitioner provided corroborating documents, that TrailerTrader was also operating and registered in the state of Indiana from 2010 to 2013. Slabaugh Declaration ¶ 29 and Exhibits A12-13. Thus, had Petitioner investigated TrailerTrader's activities during this time period, it could have discovered that its business was being conducted in Indiana.

abandoned."[47] Petitioner also asserts that it "concluded that any remaining online displays of the TRAILERTRADERS.COM mark on the [TrailerTrader] website were likely merely 'deadwood' resulting from [TrailerTrader's] activities prior to August 2012."[48]

Petitioner contends it was not unreasonable for it to wait over four years to bring this cancellation proceeding, pointing specifically to TrailerTrader being "administratively dissolved" and the abandonment of TrailerTrader's second application, both occurring in 2012. Petitioner also argues that "in light of other trademark infringement priorities, [Petitioner] took no further action until 2016."[49]

Upon review of all relevant factual circumstances, we find that it was unreasonable for Petitioner to hold off as long it did before filing the petition to cancel on December 8, 2016. Again, although the laches period does not begin to run until October 29, 2012, when Petitioner first learned of the registration, it is important to note that Petitioner, by its own admission, had actual knowledge of Respondent's filing of the underlying application as early as December 2010. And, as evidenced by Petitioner's cease and desist letter sent in April 2011, Petitioner was already under the belief that Respondent's use of the involved mark is "likely to cause confusion," and also acknowledged TrailerTrader's use of the mark on the www.trailertrader.com website. If there was any doubt that there could be a dispute, TrailerTrader's letter

---

[47] *Id.* at ¶ 68.

[48] *Id.* at ¶ 70.

[49] 14 TTABVUE 21 (Brief at p. 19, citing to Stacy Declaration ¶ 70).

in response to Petitioner's cease and desist letter made it clear that TrailerTrader would "not acquiesce" to Petitioner's demands to cease use of the TRAILERTRADERS.COM mark. Finally, Petitioner admits that it had actual knowledge of the registration a mere six days after it issued in October 2012.

Petitioner's asserted reasons for failing to file a petition to cancel Respondent's registration sooner either have little, if any, merit, or are unsubstantiated. First, as noted *supra*, Petitioner does not assert how or when it first learned that the state of Minnesota administratively dissolved TrailerTrader for failing to file a renewal or when it learned that TrailerTrader's second application was abandoned. Regardless of when Petitioner learned of these events, the involved registration issued approximately two months thereafter – and there is no dispute that Petitioner was aware of this within a week. Thus, even assuming there was reliance on either of the preceding occurrences, a reasonable person with an interest in the matter and having actual knowledge that the involved registration issued would have at least investigated. Petitioner apparently made no serious attempt to determine if TrailerTrader was continuing to use the mark that just registered. Rather, and without any additional basis or information, Petitioner concluded that "any remaining displays of the TRAILERTRADERS.COM mark [on TrailerTrader's website] were likely merely residual 'deadwood' resulting from [TrailerTrader's] activities prior to August 2012."[50] However, according to the unrebutted testimony of Mr. Slabaugh, TrailerTrader's website was being "updated daily in some form" at that

---

[50] 15 TTABVUE; Stacy Declaration ¶ 70.

time and continuously since, with new trailer advertisements or other "promotional features" being listed or edited.[51] Thus, had Petitioner made even a cursory review of the website over the period of a few days, it could have learned that the website was still active. Finally, Petitioner's assertion that "other trademark infringement priorities" prevented it from taking action prior to December 2016 lacks merit without any elaboration how any other trademark infringement activities may have prevented Petitioner from filing the petition to cancel.[52]

Having determined that Petitioner's delay in bringing its claim was unreasonable, we now must determine whether the second element of the defense is satisfied, that is, whether Respondent has suffered material prejudice as a result of the delay. "Two general categories of prejudice may flow from an unreasonable delay: prejudice at trial due to loss of evidence or memory of witnesses, and economic prejudice based on loss of time or money or foregone opportunity." *Bridgestone/Firestone*, 58 USPQ2d at 1463 (citation omitted). As to economic prejudice, we rely on Mr. Slabaugh's testimony, with exhibits, demonstrating that:

- Mr. Slabaugh, along with Mr. Gary Raak, are the only two managing members comprising the corporate LLC entities, TrailerTrader and Respondent.[53]

---

[51] Specifically, Mr. Slabaugh averred that the website "has been continuously updated since its launch, including for example, to add new trailer listings, remove old trailer listings, edit information regarding existing trailer listings, advertise promotional features, alter the arrangement of content on the webpages, add/remove/change features of the website, and provide information regarding trailers for users and viewers of the website. It is my estimation that the website has been updated daily in some form since our launch in 2010." 23 TTABVUE; Slabaugh Declaration ¶ 8.

[52] Petitioner's witness merely states "in light of other trademark infringement activities," (15 TTABVUE 20, Stacy Declaration ¶ 70), without any further clarification as to what these "activities" were or how they may have impeded Petitioner's ability to bring this cancellation.

[53] *Id*. at ¶ 1.

- Mr. Slabaugh "has been involved in the design, creation, implementation and maintenance of the www.trailertraders.com website since before the launch of the website by TrailerTrader.com, LLC, and continuing to the present. This includes writing code for the website, controlling the implementation of content for the website, and managing the operation of the website. [Mr. Slabaugh's] full time occupation since the formation of [TrailerTrader] in July 2010 has been to develop, promote and operate the www.trailertraders.com website in connection with the TRAILERTRADERS.COM trademark."[54]

- "The www.trailertraders.com website as operated by [TrailerTrader] was launched in 2010 … the TRAILERTRADERS.COM trademark was prominently displayed at the top of the homepage of the website in association with the services there provided. … the TRAILERTRADERS.COM trademark was prominently displayed at the top of many if not all of the pages of the website. The use of the TRAILERTRADERS.COM trademark in this manner on the www.trailertraders.com website has been continuous for approximately the last seven years since [2010] and continuing to today."[55]

- In view of having received no response from Petitioner subsequent to TrailerTrader's letter rejecting Petitioner's cease and desist letter demands, and with no further communication between the parties, Mr. Slabaugh "considered the matter resolved and relied on that understanding to continue my development and promotion of the www.trailertraders.com website in association with the TRAILERTRADERS.COM trademark."[56]

- Between 2011 and 2014 there was a steady amount of traffic on TrailerTrader's website and then an increase in traffic between 2014 and 2016.[57]

- At present, there are over 300 active dealers listing over 70,000 trailers for sale on www.trailertraders.com. There are over 280,000 trailers in Respondent's database and nearly 3,000 sellers. These numbers reflect the total number of trailers that have been listed for sale and the total number of sellers by TrailerTrader and Respondent.[58]

---

[54] *Id.* at ¶ 4.

[55] *Id.* at ¶¶ 5-6.

[56] *Id.* at ¶¶ 19-21.

[57] 23 TTABVUE; Slabaugh Declaration Exhibit A3.

[58] *Id.* at ¶ 10.

- The two companies, TrailerTrader and Respondent, work in tandem; the latter manages the online sales inventories for trailer dealers by assisting with their advertised inventory, including advertisements placed on the TrailerTrader website, www.trailertraders.com. When Respondent provides the inventory management service, it also requires an advertisement subscription on the website.[59]

- At the launch of TrailerTrader's website in 2010, Mr. Slabaugh was "the only person involved in the operating, developing and marketing of the business," receiving no salary, and "discounts and upgrades to users were frequently provided to users in order to promote the business." Currently, Respondent "operates the www.trailertraders.com website" and, excluding Mr. Raak and Mr. Slabaugh, Respondent now has "eight total employees, which is made up of four full time employees, two full time contract employees, and two part time contract employees."[60]

- Between 2010 and 2011, TrailerTrader "operated at a loss" as a result of efforts to "promote the business" and Mr. Slabaugh received no salary; however, between 2012 and 2016 TrailerTrader's and Respondent's annual income "has nearly doubled each year" with anticipated doubling of income from 2016 to 2017.[61] While we do not divulge the annual income figures since they have been designated "confidential," we are able to state that they are not insignificant and reflect a steady growth.

- Respondent's income includes the trailer sales inventory management services provided to trailer dealers through a www.trailercentral.com website; however, it also includes subscriptions for advertisement services "provided in in association with the TRAILERTRADERS.COM trademark" and "reflects the growth of the services provided in association with [this mark]."[62]

In view of the above and based on the entire record, we find that Respondent and

TrailerTrader made significant efforts to grow their businesses, which are based in

---

[59] *Id.* at ¶¶ 27-28.

[60] *Id.* at ¶ 30.

[61]*Id.* at ¶¶ 32-33; Slabaugh Declaration Exhibit A14. The exhibit is designated "Confidential," and identifies the profit and loss for each year during this period.

[62] *Id.* at ¶ 34.

large part on the website www.trailertraders.com and the mark TRAILERTRADERS.COM. Cancellation of Respondent's registration for this mark would result in severe economic prejudice. The evidence demonstrates a great deal of individual effort and sacrifice by Mr. Slabaugh and that cancellation of the registration would impair or nullify much of his work. As a result of his efforts under the mark, Respondent's business grew into a profitable enterprise known and branded as TRAILERTRADERS.COM during the period of Petitioner's unreasonable delay and now includes eight additional employees. Thus, Respondent has demonstrated that it would be economically prejudiced were this claim allowed.

Having determined that it was unreasonable for Petitioner to delay its assertion of rights against Respondent's registration and that Respondent would suffer material prejudice as a result of the delay should its registration be cancelled, we find Respondent's asserted laches defense to be meritorious. However, the equitable defense of laches, albeit established in this case, cannot serve as a bar against the petition for cancellation based on likelihood of confusion when confusion is, in fact, inevitable. In that event, any injury to the respondent is outweighed by the public's interest in preventing confusion. *See, e.g.*, *Ultra-White Co. v. Johnson Chem. Indus., Inc.*, 465 F.2d 891, 175 USPQ 166, 167 (CCPA 1972) ("This is not a case wherein a likelihood of purchaser confusion or mistake is reasonably in doubt, and evidence of laches… may be considered as a factor in resolving that doubt. Rather, it appears to us that confusion or mistake here is not only likely but inevitable …. In such a situation, notwithstanding the equities between the parties and the equitable

principles of § 1069, the public interest expressed in § 1052 is the dominant consideration."); *see also Hornby v. TJX Cos.*, 87 USPQ2d 1411, 1419 n.9 (TTAB 2008); *Christian Broad. Network Inc. v. ABS-CBN Int'l*, 84 USPQ2d 1560, 1572 (TTAB 2007).

Accordingly, we must now determine whether confusion is inevitable should the parties continue using their marks in connection with the involved services.

### V. Whether Confusion Is Inevitable

In determining the issue of confusion, whether it is likely and whether it rises to the level of inevitable, we consider all of the *du Pont* factors that are relevant in this case and for which there is evidence of record. *See In re E.I. du Pont de Nemours & Co.*, 476 F.2d 1357, 177 USPQ 563, 567 (CCPA 1973); *see also Turner v. Hops Grill & Bar, Inc.*, 52 USPQ2d 1310, 1313 (TTAB 1999) ("to determine whether confusion is inevitable, we must use the multifactor analysis required by [*du Pont*]"). Obviously, the standard for finding confusion to be inevitable (versus only "likely") is a higher one. *Coach House Restaurant, Inc. v. Coach & Six Rests., Inc.*, 934 F.2d 1551, 19 USPQ2d 1401, 1409 (11th Cir. 1991) (standard required for a finding of inevitable confusion is "an increment higher than that required for a finding of a likelihood of confusion"); *see also Turner v. Hops Grill & Bar, Inc.*, 52 USPQ2d at 1313 n.5. Generally, confusion has been found to be inevitable where the respective marks and goods/services are identical or nearly so. *See, e.g.*, *Metro Traffic Control, Inc. v. Shadow Network Inc.*, 104 F.3d 336, 41 USPQ2d 1369, 1373 (Fed. Cir. 1997) (affirming Board finding that confusion was "so likely that it is virtually inevitable,

because the parties are using the identical mark for the identical services") (internal citation omitted); *Ultra-White*, 175 USPQ at 167 (confusion inevitable for nearly identical BRIGHT WHITE and BRIGHTWHITE marks for laundry products). Other cases involving findings of inevitable confusion were based, at least in part, on evidence of actual confusion. *See, e.g.*, *Resorts of Pinehurst, Inc. v. Pinehurst Nat'l Corp.*, 148 F.3d 417, 47 USPQ2d 1465 (4th Cir. 1998) ("[The trademark owner's] strong proof of likelihood of confusion—indeed, actual confusion—trumps the defenses of laches and acquiescence.").

We now discuss Petitioner's asserted rights and the *du Pont* factors which are relevant under the present circumstances and for which there is evidence of record and make our determination whether confusion is inevitable should the parties continue to use their marks in connection with their respective services.

### 1. Priority and Petitioner's Asserted Rights in the TRADER Family of Marks versus Respondent's TRAILERTRADERS.COM Mark

In its ACR briefs, Petitioner relies on a pleaded family of TRADER marks "for classified advertising listing services for vehicles and vehicle-related equipment," rather than any of its individual pleaded marks, and argues that "the public will perceive" Respondent's registered TRAILERTRADERS.COM mark as a member of the family.[63] More specifically, Petitioner contends that Respondent's mark is

---

[63] 14 TTABVUE 7. In particular, we note Petitioner did not pursue its allegation that Respondent's mark is confusingly similar to Petitioner's applied-for TRAILERTRADER.COM mark of which Petitioner alleged prior use through a predecessor-in-interest. Thus, to be clear, Petitioner relies solely only its pleaded rights in a family of TRADER marks vis-à-vis Respondent's registered mark in pursuing the likelihood of confusion claim.

"confusingly similar to the TRADER family of marks in that it also consists of the name of a vehicle/category followed by the term 'TRADER.'"[64] We hereinafter refer to this pleaded family of marks as the "–TRADER family of marks."

Petitioner thus has the burden of proving that it established a –TRADER family of marks before any date that Respondent can rely upon, for purposes of priority, in its TRAILERTRADERS.COM mark. As the Board explained in *Hester Indus. Inc.* *Tyson Foods Inc.*, 2 USPQ2d 1645, 1647 (TTAB 1987):

> [I]t is well settled that the mere ownership of a number of marks sharing a common feature (or even ownership of registrations thereof) is insufficient to establish a claim of ownership of a "family" of marks characterized by the feature in the absence of competent evidence showing that prior to the first use by the alleged interloper, the various marks said to constitute the "family," or at least a goodly number of them, were used and promoted together in such a manner as to create among purchasers an association of common ownership based upon the 'family' characteristic . . . .

*See also Truescents LLC v. Ride Skin Care LLC*, 81 USPQ2d 1334, 1338 (TTAB 2006) (because plaintiff did not establish ownership of a family of marks, priority and likelihood of confusion is based on each of pleaded marks separately). In this case, Respondent has demonstrated through the testimony of Mr. Slabaugh that Respondent's predecessor-in-interest, TrailerTrader, began using the registered mark TRAILERTRADERS.COM in commerce as early as July 2010.[65]

In order to rely on the putative –TRADER family of marks, Petitioner must prove the following three elements: (1) prior use of marks that share the common

---

[64] *Id.*

[65] 23 TTABVUE; Slabaugh Declaration ¶¶ 4-6.

characteristic (the TRADER family "surname"); (2) the common characteristic, the –TRADER formation, is distinctive and not highly descriptive or suggestive and is not so commonly used as not to constitute a distinguishing feature; and (3) prior to July 2010, Respondent's first use of its mark, Petitioner's marks were used in advertising or sales so as to create common exposure to and recognition by purchasers of the common characteristic as indicating origin. *Wise F & I, LLC v. Allstate Ins. Co.*, 120 USPQ2d 1103, 1109 (TTAB 2016) (citing *Truescents*, 81 USPQ2d at 1337-38).

As to the first and third elements, the record shows that since the 1970s Petitioner, through its predecessors-in-interest and licensees, has been using various marks with a –TRADER formation element in connection with print publications in the field of advertising the goods of others and these goods, in many cases, include vehicles such as automobiles, motorcycles, boats, airplanes and ATV's.[66] Petitioner has expanded the line of publications throughout the years and, as early as 1996, began offering the same advertisement services and publications through companion websites with corresponding website addresses; e.g., the AUTOTRADER publication's URL address would be www.autotrader.com.[67] Petitioner has made attempts to promote its publications as a –TRADER family by, inter alia, adopting similar mast heads, having the magazines displayed together in a separate display rack in retail stores, and allowing customers to list a vehicle or vehicle accessory in a number of these TRADER magazines by completing a single mail-in form and

---

[66] 15 TTABVUE; Stacy Declaration ¶¶ 12-14.

[67] *Id.* at ¶¶ 29-30.

checking a box beside each print publication desired.[68] With its online publication websites, Petitioner used the same mastheads from its print publications at the top of website home pages (shown below) "to continue to promote [ ] the collective value of [the] TRADER family of marks," and provides hypertext links to its other publication websites; to wit:[69]



In 1996, Petitioner launched a TRADER ONLINE website "for the specific purpose of collectively promoting [its –TRADER publications]."[70] The website highlighted the different publications, provided hypertext links to each corresponding publication website, and provided a central point for service and support inquiries.[71] A printout of the TRADER ONLINE website from 2008 (shown below) lists the various available print publications under the banner "TRADER ON THE NEWSSTAND":[72]

---

[68] *Id.* at ¶¶ 21-24, and Stacy Declaration Exhibits 8-9.

[69] 14 TTABVUE 12 (Petitioner's Brief p. 10), citing to Stacy Declaration ¶¶ 29-33. The collection of mastheads, represented above, was reproduced in Petitioner's brief from excerpts of website printouts contained in Stacy Declaration Exhibit 14.

[70] Stacy Declaration ¶ 50.

[71] *Id.* at ¶¶ 51-55.

[72] Stacy Declaration Exhibit 22.



For several years leading up to 2010, Petitioner's sales of publications, website traffic and advertising services for others are substantial and impressive. As early as 1992, "more than 2.4 million TRADER print publications were distributed nationwide per week."[73] As of 2006, Petitioner's print publications were "distributed in tens of thousands of cities and towns across the United States [in all states]" and from 2007 to 2012 "generated more than 500 million dollars in revenue."[74] Petitioner's websites have received numerous visits; for example, the TRADER ONLINE website that promotes the Petitioner's –TRADER publications, both online and in print, received

---

[73] *Id.* at ¶ 25.

[74] *Id.* at ¶¶ 27-28.

"more than 8.5 million views and over 5.8 million visits" in 2009.[75] In total, by 2005, Petitioner's various websites with the TRADER name were "averaging 30 million visitors each month."[76] Finally, "between 2000 and 2005 alone, [Petitioner and its licensees] spent over $ 250 million in print, television and radio advertising promoting the sale of goods and services under the TRADER Family of Marks."[77]

Although Petitioner's promotional and other efforts in connection with its – TRADER formative marks are impressive, we must address the second element necessary for proving a family of marks, namely that the common characteristic be sufficiently distinctive to constitute a distinguishing feature. A term cannot serve as a separate, distinctive family characteristic if it is descriptive or highly suggestive and commonly adopted by others. *Hester Indus.*, 2 USPQ2d at 1647 (finding no family of CHIK'N marks and that "a 'family' of marks cannot be acquired in a nonarbitrary term or a term that has been so commonly used in the trade that it cannot function as the distinguishing feature of any one party's mark") (citing *Cambridge Filter Corp. v. Servodyne Corp.*, 189 USPQ 99 (TTAB 1975)); *see also Land-O-Nod Co. v. Paulison*, 220 USPQ 61, 66 (TTAB 1983) (denying claim of family of CHIRO-formative marks, while also noting the inherent weakness of CHIRO and that "[t]he evidence further establishes that the term CHIRO has been commonly used and/or registered by third parties")

---

[75] *Id.* at ¶ 55.

[76] *Id.* at ¶ 35.

[77] *Id.* at ¶ 45.

Respondent argues that the term TRADER is merely descriptive in the context of Petitioner's publications and advertisement services and thus "too weak to support a family of marks."[78] Respondent relies on various definitions of the term, including "a person who trades; a merchant or businessman,"[79] and contends that the "average purchaser would be well aware that the term 'trader' is used in connection with buying and selling something" and that Petitioner is "in the business of facilitating buying and selling the very goods that are described in the words" of Petitioner's marks.[80] Respondent also points out that four of Petitioner's registrations with the term TRADER issued under Section 2(f) and thus Petitioner has conceded that the term is not inherently distinctive.[81]

The record also shows that numerous third-parties have adopted –TRADER formative marks, i.e., the term TRADER preceded by generic or descriptive terms, and use these marks in connection with the sale or advertisement of various types of goods described by the generic or descriptive wording in the mark, or publications (online and print) involving the sale of the goods. Respondent introduced copies of 67 live, third-party registrations for such marks, along with printouts or photographs showing the use of these marks in commerce.[82] These include:

---

[78] 22 TTABVUE 11.

[79] 28 TTABVUE; definitions attached as Exhibits C76-C78.

[80] 22 TTABVUE 12.

[81] These are: TRADERONLINE.COM (Reg. No. 3161680), TRADER ONLINE (Reg. No. 2302312), BOAT, BIKE & RV TRADER (Reg. No. 1936555), and OLD CAR TRADER (Reg. No. 1911290).

[82] 25 TTABVUE (Slabaugh Declaration II Exhibits B1-B89); 26-28 TTABVUE (Exhibits C1-C67).

| Mark | Reg. No. | Relevant Goods in Registrations |
|---|---|---|
| MOBILEHOMETRADER | 4846224 | Internet advertising services relating to the field of stationary mobile homes |
| RIMSTRADER (Supplemental Register) | 5272967 | Online retail store services featuring rims, wheels and tires |
| MACHINERY TRADER (registered under Section 2(f)) | 4498244 | Providing an on-line electronic database on the Internet in the field of advertising heavy machinery for sale. |
| KAYAK TRADER .COM (stylized with design) (KAYAK TRADER.COM disclaimed) | 4630834 | Providing paddle sport information via a global computer network, namely, information about paddle boats and paddle boat parts and accessories for sale. |
| TIRETRADER | 3760939 | Computer software for tire wholesalers and retailers providing pricing, inventory availability and account information along with online ordering capability. |
| MARINE TRADER | 1520780 | Motorboats. |
| INDUSTRIAL MACHINE TRADER | 1284271 | Periodic advertising magazine dealing with work machinery. |

Respondent, through the testimony of Mr. Slabaugh and corresponding exhibits, also submitted evidence that many of these registered marks, as well as other unregistered marks with the term TRADER, are actually in use by third-parties.[83] This includes the use of the marks MACHINERY TRADER, INDUSTRIAL MACHINE TRADER, PARTSTRADER, KAYAK TRADER.COM,

---

[83] *Id.*

MOBILEHOMETRADER, and CARTRUCKTRADER.[84] As to the latter mark, CARTRUCKTRADER, Mr. Slabaugh averred that this unregistered mark is used in connection with "the providing of vehicle classifieds" at the website www.cartrucktrader.com "in its current or similar form since at least February 1999" and "used prominently in mobile applications for both the Android and Apple operating systems."[85] The following are printouts from the website and pages promoting the Apple and Google Play apps:



---

[84] *Id.* at ¶¶ 1-14.

[85] *Id.* at ¶ 14; Slabaugh Declaration II Exhibits B29-31 (25 TTABVUE 89-97).



Printouts showing use of TRADER-formative marks include the following:





["TrailerTrader.net" in use since at least October 2004];[86]

---

[86] *Id.* at B24-25.





["Machinery Trader" in use since at least as April 1999];[87]

---

[87] 25 TTABVUE; Slabaugh Declaration II ¶ 2, Exhibits B2-B5.





["Industrial Machine Trader" in use since October 2007];[88]



---

[88] *Id.* at B6-B8.



["Military Trader" in use since at least October 2005];[89] and



["Horse Trailer Trader" in use since at least November 2006].[90]

---

[89] *Id.* at B20-B22.

[90] *Id.* at B27-B28.

Petitioner argues that several of the third-party registrations and uses, namely, those involving the marks PARTSTRADER, MOBILEHOMETRADER, and CARTRUCKTRADER, are "not relevant because they are subject to confidential settlement agreements in which the registrants expressly agreed not to offer classified advertising services for vehicles and/or limit their activities to a limited geographic region."[91] However, there is no reason to believe that consumers would have knowledge of these agreements. Thus, while the use of these marks may be limited by agreement, consumers exposed to these marks will view them as additional, unrelated –TRADER formative marks.

The term "trader" is inherently weak, and perhaps descriptive, in the context of bringing sellers and buyers together given its defined meaning as "a person who trades; a merchant or businessman." The weakness is accentuated when it is preceded by terms that are descriptive or generic for the particular type or field of goods being offered for sale. The numerous third-party registrations and uses of –TRADER formative marks, including those not specifically discussed in this decision, illustrate the frequency and ease with which businesses adopt such marks. It can hardly be considered unusual for a business to use a –TRADER formative mark if it is involved in the sale of goods identified by the descriptive and generic terms, including both direct sales and indirect sales by allowing the placement of advertisements through a website or publication.

---

[91] 30 TTABVUE 8.

While there is little evidence showing the extent to which consumers have been exposed to the third-party –TRADER formative marks, the circumstances in this case are akin to those in *Juice Generation, Inc. v. GS Enter. LLC*, 794 F.3d 1334, 115 USPQ2d 1671, 1674 (Fed. Cir. 2015), where our reviewing court found that although evidence of the extent of use by numerous third-parties was not submitted, evidence of widespread third-party use in and of itself was probative in light of the "fair amount" of third-party uses submitted into evidence. Such evidence can be "powerful" evidence of weakness. *Id.*; *Jack Wolfskin Ausrustung Fur Draussen GmbH & Co. KGAA v. New Millennium Sports, S.L.U.*, 797 F.3d 1363, 116 USPQ2d 1129, 1136 (Fed. Cir. 2015).[92]

Ultimately, we find –TRADER formative marks are so commonly used by others that the shared –TRADER element in Petitioner's marks does not constitute a distinguishing feature. Petitioner cannot lay claim to a family of marks based on this common trait in its marks, despite the evidence showing Petitioner's efforts to establish such a family of marks.[93] Without having shown that it is the owner of the pleaded family of –TRADER formative marks, Petitioner cannot prevail on its likelihood of confusion claim.

---

[92] We note for comparison to the sixty-seven registrations here that, in *Juice Generation*, there were approximately twenty-six relevant, third-party uses or registrations of record, *see* 115 USPQ2d at 1672 n.1, and in *Jack Wolfskin*, there were at least fourteen, *see* 116 USPQ2d at 1136 n.2.

[93] *Cf.* TMEP § 1212.06(b) (Oct. 2017) ("The ultimate test in determining whether a designation has acquired distinctiveness is applicant's success, rather than its efforts, in educating the public to associate the proposed mark with a single source.")

For sake of completeness, we address the remaining *du Pont* factors relevant to this proceeding and for which evidence has been submitted.

## 2. The Services and Established (and Likely to Continue) Trade Channels

The record shows that Petitioner renders services, under its various pleaded marks, that are the same or very similar to those covered by the involved registration, namely, "preparing and placing advertisements for others [and providing consumer information] in the field of trailers, trailer parts and trailer accessories all via the internet." That is, Petitioner's customers have included "individuals and dealers" who have placed advertisements "for the sale of vehicle trailers" in Petitioner's publications and websites.[94]

We further agree with Petitioner, and the evidence clearly supports, that both parties "offer their services over the Internet" and there is some overlap in the classes of purchasers. The parties advertise to "those seeking to buy or sell vehicles and vehicle accessories – in this particular instance vehicle trailers – online."[95] Moreover, both parties tout their services at trade shows. Simply put, it stands to reason the parties will cater to the same types of consumers and market their services in the same manner given that Petitioner currently has approximately "30,000 separate

---

[94] 15 TTABVUE; Stacy Declaration ¶ 38 and Exhibit 34 (15 TTABVUE 661-695). Ms. Stacy averred such advertisements were placed in Petitioner's ATV TRADER, ATV TRADERONLINE.COM, BOAT & RV TRADER, BOAT TRADER, BOAT, BIKE & RV TRADER, CYCLE TRADER, CYCLE, BOAT & RV TRADER, EQUIPMENT TRADER, RV TRADER, and RV TRADERONLINE.COM publications or affiliated websites.

[95] 14 TTABVUE 30 (Brief p. 28).

[average daily] listings" for vehicle trailers in printed publications and websites[96] and Respondent currently has approximately twice this amount listed on its website.[97] In other words, the parties are direct competitors.

Accordingly, if we had found that Petitioner has prior rights in a –Trader formative family of marks, and we reiterate that we do not make such a finding, we would find the factors involving the similarity of services, trade channels and classes of consumers favor Petitioner.

### 3. No Instances of Actual Confusion During Seven Years of Coexistence

"[E]xtended periods of side-by-side sales without actual confusion may tend to refute a likelihood of confusion...." *Han Beauty, Inc. v. Alberto-Culver Co.*, 236 F.3d 1333, 57 USPQ2d 1557, 1560 (TTAB 2001); *see also du Pont*, 177 USPQ at 567 (identifying seventh and eighth *du Pont* factors as "[t]he nature and extent of any actual confusion," and "[t]he length of time during and conditions under which there has been concurrent use without evidence of actual confusion"). For the absence of actual confusion to be probative, there must have been a reasonable opportunity for confusion to have occurred. *Citigroup Inc. v. Capital City Bank Group Inc.*, 94 USPQ2d 1645, 1660 (TTAB 2010), *aff'd*, 637 F.3d 1344, 98 USPQ2d 1253 (Fed. Cir. 2011); *Barbara's Bakery Inc. v. Landesman*, 82 USPQ2d 1283, 1287 (TTAB 2007) (the probative value of the absence of actual confusion depends upon there being a significant opportunity for actual confusion to have occurred).

---

[96] 15 TTABVUE; Stacy Declaration ¶ 39 and Exhibit 17 (for years 2016-2017) (designated "confidential").

[97] 23 TTABVUE; Slabaugh Declaration ¶ 10.

In this case, we find that there has been ample time and opportunity for actual confusion to occur but there have been no reported instances. Up to trial, approximately seven years have passed with Respondent's TRAILERTRADERS.COM mark coexisting in use with Petitioner's various – TRADER formative marks. Since 2010, Respondent's mark has been advertised nationwide in connection with trailer advertisement services, including mailings and trade show appearances;[98] Respondent has listed approximately 280,000 trailers for sale on its website for approximately 3,000 sellers;[99] and its website has had "over 1.2 million users."[100] During this time and as discussed above, Petitioner has heavily promoted its –TRADER formative marks and currently has "over 30,000 … average daily listings of vehicle trailers."[101] Petitioner has stated that it is "unaware of such instances [of actual confusion between the parties' marks] other than the USPTO's determination that [Petitioner's] TRAILER TRADER mark was likely to be confused with the mark shown in Respondents' TRAILERTRADERS.COM Supplemental Register Registration."[102] Respondent's principal, Mr. Slabaugh, has likewise averred that "[t]here has never been, to my knowledge, any confusion whatsoever between the [parties' marks]" and that neither TrailerTrader nor Respondent "has ever

---

[98] 23 TTABVUE; Slabaugh Declaration ¶¶ 11-12.

[99] *Id.* at ¶ 10.

[100] *Id.* at ¶ 9.

[101] 15 TTABVUE; Stacy Declaration ¶ 39.

[102] 29 TTABVUE; Respondent's Exhibit D (Petitioner's response to Respondent's Interrogatory No. 13).

received any inquiry, question or mistaken transmission or communication confusing the services provided by [anyone associated with Petitioner]."[103]

Given there has been a reasonable opportunity for confusion to have occurred during the last seven years between similar marks for identical services, and the parties' acknowledgment of the absence of any instances of confusion, we find this evidence probative as to both whether confusion between the parties' marks is likely and whether confusion is inevitable.

Accordingly, we weigh the eighth *du Pont* factor, involving the length of time during and conditions under which there has been concurrent use without evidence of actual confusion, in Respondent's favor and against a finding that confusion is inevitable.

### 4. Conclusion

As discussed, Petitioner has not established that it is the owner of a –TRADER family of marks, as pleaded, because the term TRADER is inherently weak and –TRADER formative marks are so commonly used in connection with similar services and publications. Thus, the question of whether confusion is inevitable is moot given that Petitioner cannot prevail on a likelihood of confusion claim that is predicated on ownership of the family of marks.

Even if, *arguendo*, we were to find that Petitioner established prior rights in its pleaded family of marks, we do not find that confusion is inevitable and, given

---

[103] Slabaugh Declaration ¶ 31. Mr. Slabaugh further averred that his "knowledge of this complete lack of confusion is based on my intimate knowledge of the operations and business, as well as based on my inquiry to our employees." *Id.*

Respondent's meritorious laches defense, such a finding is necessary for Petitioner to prevail. Despite the parties rendering the same or very similar services and these services being offered in the same trade channels to the same classes of purchasers, we do not find that it is inevitable that consumers would mistakenly believe that Respondent's TRAILERTRADERS.COM mark is a member of or affiliated with Petitioner's putative family of marks. This conclusion is based on the already-discussed weakness of the term TRADER and the existence of numerous third-party uses of –TRADER formative marks in connection with similar services and publications. The lack of any known instances of actual confusion over the past seven years of the marks' coexistence, despite reasonable opportunity for confusion to occur, further corroborates that confusion would not be inevitable.

**Decision:** Petitioner's claim under Section 2(d) of the Trademark Act is barred by laches and the petition for cancellation is denied.